### WESTERN ELECTRIC CO. v. ROBERTSON, et al.

(Circuit Court of Appeals, Second Circuit. December 5, 1905.)

#### No. 15

1. PATENTS—CONSTRUCTION OF LICENSE—ROYALTY.

A contract by which a patentee licensed defendant to use any one or more of the devices "described and claimed" in a patent, and required defendant to pay a royalty therefor must be construed as requiring payment only for the use of such devices as defendant would not otherwise have the right to use because covered by the patent, and does not subject him to payment of royalty because of his use of one element only of a combination patented as a whole.

2. SAME—INFRINGEMENT—WHEN QUESTION OF LAW.

Where the question of infringement depends entirely upon the construction of a patent, either upon its face, or in connection with facts not to be reasonably disputed, the question is one of law for the court.

[Ed. Note.—For cases in point, see vol. 38, Cent. Dig. Patents, §§ 240, 434, 552.]

3. SAME—INFRINGEMENT—HYDRAULIC LEAD PRESS.

The Robertson patent, No. 346,563 for a hydraulic lead press construed in an action for the recovery of royalties from a licensee, and *held* so limited by the prior art as not to embrace the structure of defendant, so as to render it liable for royalties thereon.

In Error to the Circuit Court of the United States for the Eastern District of New York.

This cause comes here on writ of error by defendant from judgment entered in favor of plaintiffs in the United States Circuit Court for the Southern

District of New York on a verdict for $35,000 damages for breach of contract for payment of royalties under plaintiffs' patent, No. 346,563, granted to John Robertson, August 3, 1886, for a hydraulic lead press. The action was originally brought in the Supreme Court of New York, but was duly removed to the federal court.

Edward Rector, for plaintiff in error.

A. C. Fraser and George M. Barton, for defendant in error.

Before WALLACE, LACOMBE, and TOWNSEND, Circuit Judges.

TOWNSEND, Circuit Judge. The 44 assignments of error challenge the correctness of the action of the trial court in its rulings, charges, refusals to charge, and refusal to direct a verdict in favor of defendant. The view taken of the case dispenses us from the necessity of discussing any of the questions raised, except those based on the refusal of the court to direct a verdict for defendant. There is no claim of novelty in the patented press, except such as relates to the arrangement of a bridge and a die and core-tube in a chamber, all located in a block.

The contract in question licensed defendant to use "lead presses containing any one or more of the devices described and claimed in the said letters patent," and provided for payment by defendant of a royalty of one-eighth of a cent for each pound of lead passed through said presses. It is argued that thereby defendant became liable for the use of any part of the patented press, even though such part was only a single element of a patented combination. This contention is without merit. The consideration upon which defendant agreed to pay royalties was the privilege of using "the devices described and claimed." This must be interpreted as an agreement to pay for the use of such devices as the defendant would not otherwise have the right to use, namely, such as were covered by the claims of the patent, and not for such as were merely described and not claimed, or were included as single elements only in a combination claimed as a whole. It is further argued that the contract is to be interpreted in the light of the situation and acts of the parties and the practical construction put by them upon its terms, and that, therefore, as defendant during some nine years used blocks claimed to embody the patented invention, and paid royalties thereon, it is estopped to deny that the blocks afterwards used were within the patented constructions. This argument might have considerable weight if the blocks on which defendant paid royalties had not contained the patented bridge and thus differed substantially from those on which defendant has refused to pay royalties. But we are satisfied, in view of the radical departures from said licensed blocks, and from the patented construction, in defendant's later blocks, that it is not precluded from showing that said blocks are not covered by the claims in suit. The decisive issues involved, and upon which this case was tried by both parties, are those of the scope of the patent under which the royalty agreement was made, and of the character of the modifications introduced by defendant.

Figures 1 and 4 of the Robertson patent show the details of construction.

A is a lead holding cylinder; B is a plunger; C is a ram; the dotted diagonal lines, d, d, inclosing arrows, directly below the cylinder, A, show the location of two of the passages in a metal block, D′, opening into the spherical coating-chamber, D; the intact portion of the block left between these passages and intermediate said cylinder, A, and cham-

ber, D, is the "peculiar bridge," G. E, and E′, are a die and core-tube, respectively, bored transversely in the block and screw threaded, and shown at e and é. The press was designed for coating wire and making lead pipe, by the use of lead reduced by heat to a condition just short of fluidity, and the principle, discovered as early as 1841 and utilized in the patent in suit, is that lead in such a condition, "being still under heat and extreme pressure in a close vessel, will reunite perfectly after a separation of its parts, and 'heal,' as it were, by the first intention, as completely as though it had never been divided."

The invention of the Robertson patent consisted· in a departure from the prior art in providing, in a construction where the die, E, and core-tub, E′, were placed in a horizontal line at right angles to and below the lead cylinder, a single coating chamber, D, and a "peculiar bridge, G, * * * intermediate said cylinder and chamber;" the bridge being peculiar in construction, function and result, as follows: Its peculiar construction was the result of cutting in the block above the coating-chamber passages, d, d, "two or more in number," on either side of the opposed die and core-tube, "so that their mouths in said chamber open upon either side of the opposed die and core-tube, thus leaving that portion of the said wall or block immediately over the line of the said die and tube intact, as shown at G. This portion, G, thus constitutes a bridge between the cylinder and the chamber, D, in line with the opposed die and core-tube." The peculiar function of said bridge was that thereby "the lead pressed into the chamber, D, from the cylinder is prevented from descending and impinging directly upon the die and core-tube by the bridge, G, the lead entering the, chamber by the passages on each side of said die and tube."

The peculiar result was the equalization of pressure, as thus stated by the patentee:

"When the chamber is filled, the pressure from all sides toward the center will be substantially equal, and thus the lead will be forced into the die and around the wire from the core with the same pressure at all points on the circumference of the wire, and the coating thereby given the wire will be of uniform thickness throughout. The liability of the core-tube and die to be fractured or clogged by an unequal pressure on opposite sides is wholly avoided in my apparatus."

The patented structure was shown and preferably constructed so that "only the noses, or but a fractional part of said die and tube, are exposed in the chamber, the main portion of the entire length of said die and tube lying in and being sustained by their said seats in the block."

These features are specifically covered in the two claims in suit, which are as follows:

"(1) In a lead-press, the combination. with the lead-cylinder, of a coating-chamber, in the walls of which are seated a diametrically-opposed die and core-tube, together with a passage or passages leading from said cylinder and opening into said chamber on each side of said die and core-tube, and a bridge or partition intermediate the cylinder and the chamber, and in line above the opposed ends of the said die and core-tube, as and for the purpose specified."

"(4) In a lead-press, the combination, with the lead-cylinder, of a distinct and separate metal block intermediate the cylinder and the ram, in which is formed the coating-chamber, together with a bridge intermediate said cylinder and chamber, and in line above the die and core-tube, which are seated, diametrically opposed, in the walls of said chamber, and passages (one or more) leading from said cylinder and opening into said chamber on each side of said die and core-tube, as and for the purpose specified."

The prior art did not show this specified construction or mode of operation. Its state is well illustrated by Fig. 2, Eaton patent, No. 225,811, of 1880.

There the opposed noses of the die, F, and core-tube, C, are located beyond the left wall of the lead cylinder at the outlet side of the coating-chamber, and the column of lead passes downwardly and sideways into the coating-chamber and issues therefrom in the form of a tube, as shown. The tapering nose of the core-tube is not directly protected against pressure from above, but said pressure is relieved and directed to the left by the side wall of the block, X, projecting out over about one-half of said nose. Lead presses having blocks constructed in accordance with the specifications of the Robertson patent were practical, and commercially successful.

After some years the block structure was successively modified, as follows: In the first modification the opposed ends or noses of the die and core-tube were moved away from the position below the center of the lead cylinder to a position at the extreme left of the chamber, so that the face of the die formed one of the side walls of

*Fig. 2.*

said chamber. Next, the tapering nose of the die was removed, and the coating-chamber was changed so as to become pear-shaped, the narrow portion extending out and around the die. This construction was similar to that shown in the Eaton patent, plus the peculiar bridge, G, of the patent in suit. Next, an annular construction was introduced at the end of this chamber, so as to make the open space below the bridge in the shape of a pear with its narrow portion cut off, or "turnip-shaped," as it is called, with a flattened sphere added thereto. The defendant having purchased blocks thus constructed, and having ascertained that a press with said blocks might be practically operated without using the part of the block above the chamber formed by the two passages, and heretofore known as the "bridge" removed said part and cut away a portion of the upper half of the block above the turnip-shaped chamber. The result of these changes is that the lead is not "prevented from descending and impinging upon the die and core-tube by the bridge, G;" that the "portion, G,"

shown in the patent, does not "constitute a bridge between the cylinder and the chamber, D," by "leaving that portion of the side wall or block immediately over the line of the said die and tube intact" by passages "cut through the wall or block between the cylinder and the chamber, so that their mouths in said chamber open upon either side of the opposed die and core-tube," as shown in the patent. The nose of the die is no longer "exposed in the chamber," and it is claimed that there are no longer two "passages leading from said cylinder" in any sense, that there is but one passage around the core-tube, and that in no event are there any passages opening into said chamber on each side of said die, because, as already shown, the die has no projecting end and no sides.

The contention of plaintiff upon these points is as follows: The Robertson patent is for a primary invention because it "performed a function never before performed; it provided for equalizing the pressure of lead in the coating-chamber where the lead issues at right angles to the axis of the cylinder, and for protecting the meeting ends of the core-tube and die from the effect of such unequal pressure."

Upon the theory that the settled rule as to equivalents of primary inventions should be applied to this patent, plaintiff argues as follows: The patentee is not limited to the bridge, passages, coating-chamber, or other details of construction, as described, shown, and claimed in his patent, but may claim as equivalents such constructions as employ substantially the same means to accomplish the same result; that is, which are identical in function and substantially so in mode of operation. Walker on Patents, §§ 359, 362, and cases cited. Therefore, plaintiffs argue that the side portion of the wall of the block left intact when the passages are eliminated is the equivalent of the portion left intact when the passages are employed, and is therefore the "peculiar bridge" in construction, and that its function is substantially the same, because it serves to protect the die and core-tube from the pressure of the lead. They further argue that the entire elimination of the two passages by cutting away the upper side of the block is a mere colorable evasion, because there is no change of function, and that the language of the patent requiring or referring to two passages merely means that there must be two passages where the streams of lead enter the coating-chamber. Upon this assumption they contend that the small annular space formed by the constriction in the walls of the so-called turnip-shaped chamber is the coating-chamber, and that the remaining larger space is merely passage; that is, a continuation of the passages, d, d, shown in the drawing of the patent in suit. Plaintiffs further argue that the patent in suit is not limited to the central location of die and core-tube under the cylinder, but that the invention is broad enough to cover their changed location and arrangement at the extreme left of the chamber.

A primary invention is "one which performs a function never performed by any earlier invention." A secondary invention is one which performs a function previously performed, but in a substantially different way. Walker on Patents, §§ 353, 359. "This word [pioneer], although used somewhat loosely, is commonly understood to denote a patent covering a function never before performed, a wholly novel

device, or one of such novelty and importance as to mark a distinct step in the progress of the art, as distinguished from a mere improvement or perfection of what had gone before." Westinghouse v. Boyden Power Brake Co., 170 U. S. 537, 561, 18 Sup. Ct. 707, 718, 42 L. Ed. 1136.

The Robertson block did not first provide a means for making pipe where the pressure was equal around the sides of the core-tube, for the Hansons had discovered and patented in 1841 a practical construction in which this result was accomplished in a chamber where the pipe issued vertically. Robertson did not first provide a construction for equalizing pressure in order to prevent it from deflecting the end of the core-tube, for in the earlier patents with horizontally located die and core-tube the descending lead was caused to flow all around the sides of the core-tube in a line parallel to its axis, with a resultant reduction of pressure upon the core-tube. The specification, drawing, and claims of the patent in suit show that what Robertson conceived and patented was a press equipped with a block radically different from those of the prior art in the location of a coating-chamber directly below the column of lead. A "peculiar bridge" was interposed between the column of lead and the chamber, the function of which was to obstruct the flow and protect the noses of the die and core-tube projecting into said chamber from being deflected by the greatly increased pressure resulting from this change of location, and passages were bored in the block around the bridge so as to divert and equalize the pressure. Each one of these features is emphasized by the patentee in the specifications. True he says the "chamber is preferably located vertically below the lead cylinder," etc. But it is manifest, for the reasons stated, that he considers this invention to consist in novel means for diverting pressure resultant from a novel conception of such a centrally located chamber. By means of a block having this peculiar bridge construction, he purposed to obviate the objections found in the structures of the prior art, of which the Eaton patent is a type, and to secure the advantages of a direct, central, downward pressure and direct, central protection against, and equalization of, said pressure.

The prior art failed to show any such device for equalizing pressure. In its structures the lead, either passed out vertically in the form of a pipe, under equal pressure, or under downward pressure, flowing around the side of the die and core-tube, was diverted in a horizontal direction before entering the die. But even if it be assumed that Robertson first provided a device for equalizing pressure, this assumption would be immaterial upon the question of infringement herein, because his device was introduced to obviate the objections to the direct downward pressure, which resulted from his central location of cylinder, by virtually splitting the column into streams through the passages around the obstructing bridge, while the defendant, by adopting the indirect pressure location of the prior art, has avoided such pressure and rejected the means by which it was obstructed and equalized. The patentee created a new pressure construction, and a new device for obstructing and diverting the pressure. He created a difficulty and met it. The defendant had no such diffi-

culty to meet. Therefore, whether the Robertson invention is a primary one, because it first performed the function of equalization of pressure, or is a secondary one, because it performed said function, provided for in the prior art, but performed it in a substantially different way, the defendant does not infringe. The record indicates that presses constructed in accordance with the patent were impracticable for certain kinds of work. Thereupon, the patentee, in seeking to improve his structure, abandoned the construction and location of the chamber below the bridge, and returned to the construction of the prior art by moving the die, core-tube, and chamber to the outlet side of the block, so that the die no longer projected into the chamber, and thereby secured a protection from below and above for the die and core-tube, not provided for in the patent at all; and thus, to that extent, dispensed with the necessity for the protection of his peculiar bridge from above. Defendant, having used this construction and ascertained by experiment that the peculiar form of bridge of the patent was no longer necessary, cut it out, and cut away a portion of the block above the bridge, thus dispensing both with said bridge, the passages, the central chamber, and the projecting die, and using the core-tube projecting across the chamber, as shown in the Eaton patent, and similarly supported.

As is said in Sandwich Enterprise Co. v. Joliet Mfg. Co., 91 Fed. 254, 257, 33 C. C. A. 491, 494:

"But in altering their device in that way they abandoned the conception of the patent, and conformed their machines substantially to designs which prevailed before the Gillet patent was issued."

It may be true that the defendant learned how to make his structure from the modifications first shown by the patentee, but as these modifications are not covered by the patent, but are departures therefrom toward the prior art, they furnish no support to the charge of infringement. In the light of these conclusions we are called upon to consider only the assignment of error, on the ground that the court should have directed a verdict for defendant, except as to amount of $40.82, admitted to be due to plaintiffs. Where the question of infringement depends entirely upon the construction of a patent, either upon its face or in connection with facts of such a nature and effect as not to be reasonably disputed, the question is one of law for the court. De Loriea v. Whitney, 63 Fed. 611, 11 C. C. A. 355; Black Diamond Co. v. Excelsior Co., 156 U. S. 611, 15 Sup. Ct. 482, 39 L. Ed. 553; Singer Company v. Cramer, 192 U. S. 265, 24 Sup. Ct. 291, 48 L. Ed. 437. In interpreting the Robertson patent, we must read into it the limitations imposed by the disclosures of Eaton. A comparison of defendant's structure with that of Eaton shows that defendant has merely taken the Eaton structure with the wing or portion of a wall above the core-tube and improved upon it.

We are of the opinion, therefore, that the construction of the patent in suit is determined, as a matter of law, by the limitations of the prior art, and that when thus interpreted its scope cannot be extended to embrace the defendant's structure.

The judgment is reversed, with costs.