# UNITED STATES *v.* HARVEY STEEL COMPANY.

# MIDVALE STEEL COMPANY *v.* HARVEY STEEL COMPANY.

### APPEALS FROM THE COURT OF CLAIMS.

Nos. 615, 616. Submitted January 6, 1913.—Decided February 3, 1913.

The construction given to a contract by this court is either author-
itatively controlling or conclusively persuasive in a subsequent suit
between the same parties; and so held that the contentions relied
on in this case as to the contract heretofore construed in *United
States* v. *Harvey Steel Co.*, 196 U. S. 310, are, in the light of that
decision, so frivolous that the judgment of the Court of Claims fol-
lowing it should be affirmed without further argument.

*United States* v. *Harvey Steel Co.*, 196 U. S. 310, followed to effect that
the Government is liable for royalties on the Harvey process even
though every element thereof was not used on the plates involved in
this action, and even though the contractor furnishing the plates
and who used the process by permission of the United States was not
specifically required to use it.

46 Ct. Cl. 298, affirmed.

THE facts, which involve the construction of a contract
with the United States for use of a steel hardening process
and the effect of the prior construction thereof by this court
in a suit between the same parties, are stated in the opinion.

*Mr. James R. Sheffield* and *Mr. James J. Cosgrove* for
appellee, in support of motion to affirm.

*Mr. Assistant Attorney General John Q. Thompson* and
*Mr. Philip M. Ashford* for the United States, appellant
in No. 615, in opposition to the motion.

*Mr. A. H. Wintersteen, Mr. Frederic D. McKenney* and
*Mr. Frank S. Busser* for Midvale Steel Company, appel-
lant in No. 616, also in opposition to the motion.

MR. CHIEF JUSTICE WHITE delivered the opinion of the court.

These appeals are from a judgment in favor of the Harvey Steel Company and against the United States for $123,467.23. This was the amount of royalty found to be due to the Harvey Steel Company under a contract, dated April 12, 1893, to pay royalty on all armor plate treated by the Harvey process and used by the United States. The armor plate under which the royalty in question was allowed was manufactured for the United States under four contracts with the Midvale Steel Company. 46 Ct. Cls. 298. The Midvale Steel Company, for the protection of its interests under the contracts, was permitted to intervene, and it was also allowed to appeal from the judgment. The case is before us on a motion to affirm under paragraph 5 of rule 6.

The questions for decision involve the construction of the contract between the United States and the Harvey Steel Company. As the meaning of that contract was passed upon by this court in a previous case between the same parties (196 U. S. 310) and the construction then given to the contract is here either authoritatively controlling or conclusively persuasive, we recur to that case and what was decided in it as the most direct means of not only analyzing and disposing of the issues here presented for decision, but moreover of causing it to be apparent that whatever may have been the original force of the contentions relied on, they are, in the light of the previous decision, "so frivolous as not to need further argument."

Following tests of armor plate treated by the Harvey process an option was given to the Government, at the request of the Navy Department, for the purchase of the right to use the process upon vessels the construction of which had at that time been authorized by Congress. The

option was given on March 3, 1891, and the patent for the process—No. 460,262—did not issue until September 29, 1891. The Harvey Steel Company, appellee, became the owner of the patent on October 7, 1891. The process was defined in the patent as follows:

" 1. The herein-described method of producing a decrementally hardened tenacious armor plate, which consists of inclosing a low steel plate between a mass of noncarbonaceous material on one side and a mass of granular carbonaceous material firmly packed upon the other side contained in a compartment formed within the heating chamber of a suitable furnace and in maintaining the said heating chamber for a predetermined period of time at a temperature above the melting point of cast iron, and in subsequently chilling said plate, whereby a stratum of steel of prescribed thickness upon the side of the plate against which said carbonaceous material has been pressed is made to acquire a heterogeneous crystalline structure and a condition of excessive hardness upon its exposed surface and a condition of gradually diminishing hardness as the depth from said surface increases."

After further tests the United States entered into an agreement on March 21, 1892, with the Harvey Steel Company to purchase the right to employ the Harvey process in Harveyizing—as it is sometimes called—the armor for twelve designated vessels. Subsequently, on October 8, 1892, the Harvey process was definitely and formally adopted by the Navy Department; and, as said in the opinion in 196 U. S. p. 314; in pursuance of the contract of March 21, 1892, "the Navy Department required and received from Harvey a revelation of the secret process and improvements" used in the treatment of armor plate by the Harvey process. Subsequently, at the request of the United States, the contract of March 21, 1892, was abrogated and in its stead a contract was entered into on April 12, 1893. By this contract, the United States was

granted the right to use for the treatment of armor plate
for its vessels the "Harvey process" and any and all im-
provements made by the Harvey Steel Company upon
such process, and to use and employ the armor plates
manufactured according to said process. The United
States agreed to pay the Harvey Steel Company a royalty
of one-half cent per pound on the finished plate.

The case in 196 U. S. was brought to recover royalties
alleged to be due to the Harvey Steel Company under the
contract of April 12, 1893, calculated on the weight of
armor supplied to the United States by the Bethlehem
Iron Company and the Carnegie Steel Company. The
Harvey Steel Company obtained judgment in the Court
of Claims, and that judgment was affirmed by this court.
The questions presented and decided were (a) whether
under the contract of 1893 the United States could set up
the invalidity of the patent as a defense; and (b) whether
the United States ought to have been allowed to show that
it had not used the patent, properly construed, although
it had used "the process communicated to it and known in
common speech as the Harvey process." After answering
the first of these propositions in the negative, the court
came to consider the claim asserted under the second
proposition, viz: "that at the time the contract was made
it was supposed that the heat required for the process was
greater than that actually used, that the patent was valid
only for a process with the greater heat, and that the con-
tract covers no more than the patent." In deciding
against this contention, the court said (p. 317):

"But the fact that the parties assumed that the process
used and intended to be used was covered by the patent,
works both ways. It shows that they thought and meant
that the agreement covered and should cover the process
actually used. We think that this can be gathered from
the agreement itself apart from the mere supposition of
the parties. The contract dealt with a process 'known as

the Harvey process.' It imported the speech of the parties and the common speech of the time into the description of the subject matter. The words, Harvey process, commonly are put in quotation marks in the first contract, thus emphasizing the adoption of common speech. They mean the process actually used. The contract states that it is dealing with the same thing that had been the subject of the former agreement. That agreement further identified that subject as a process which was tested at the Naval Ordnance Proving Ground. It also identified it, it is true, as a patented process, but, if the incompatibility of the two marks is more than trivial, as it was regarded by the court which found the facts with which we have to deal, the identification by personal familiarity and by common speech is more pungent and immediate than that by reference to a document couched in technical terms, which the very argument for the United States declares not to have been understood. It is like a reference to monuments in a deed. As we have said, this identification by personal experiment and by common speech is carried forward into the contract in suit. The latter contract manifests on its face that it is dealing with a process actually in use, which requires the communication of practical knowledge and which further experience may improve."

In concluding the opinion it was observed (pp. 318, 319)—:

"But the fuller the statement should be made the more fully it would appear that the United States was dealing with a matter upon which it had all the knowledge that any one had, that it was contracting for the use of a process, which, however much it now may be impugned, the United States would not have used when it did but for the communications of the claimant, and that it was contracting for the process which it actually used—a process which has revolutionized the naval armor of the world."

This decision plainly refutes the contention now again urged that the Harvey process of the contract of 1893 is limited and strictly confined to the method of the patent, and it is here controlling. Furthermore, in no possible view do the findings in the present case present facts which even suggest the possibility of a different construction of the contract than that heretofore given. Those findings may be thus summarized: The method described in the patent for "producing a decrementally hardened tenacious armor plate" consisted in "inclosing a low steel plate between a mass of noncarbonaceous material on one side and a mass of granular carbonaceous material firmly packed upon the other side contained in a compartment formed within the heating chamber of a suitable furnace," etc. The noncarbonaceous material actually used in the "Harvey process" consisted of sand packed at the back of the plate to protect the same from the carbonaceous material and excessive heat, of which the Government was advised by the patentee by an exhibition of the process with the use of sand prior to the contract of April 12, 1893.

The use of sand was gradually discontinued, because the same result could be accomplished without it, and some of the companies manufacturing plates were so advised late in 1893. Since 1904 no sand or other noncarbonaceous material has been used by the Carnegie and Bethlehem companies manufacturing armor plate.

The process used by the Midvale Steel Co. in the manufacture and production of armor plate was as follows: The plate to be carbonized was mounted, face up, on brick piers about 18 inches high, resting on the car bottom, about 1 foot apart. A row of bricks, 2 high, was then placed around the plate and the carbonizing material was put inside of these bricks on the face of the plate and raised about three-fourths of an inch above the bricks. Mortar was edged up on the second bricks. Then the

second plate was placed on the carbonizing material, face down. The plates were then run into the furnace and the fire started.

The brick box containing the carbonaceous material prevented the same from reaching the back and sides of the plates, thus accomplishing the same result as with the sand which was used to protect the back of the plate from the carbonaceous material and excessive heat as aforesaid.

The contention of the appellants on this branch of the case was thus stated by the court below in its opinion:

"In the present case the contention of the defendants and the intervenor is that in the hardening or Harvey process referred to, one of the elements required was the use of sand, a non-carbonaceous material packed in the back of the plates, and that if not so used it cannot be contended that the Harvey process was applied by the Midvale Steel Co. in the process which it used in hardening the plates under its several contracts with the United States, though in other respects it concedes that the Harvey process was substantially used. Its contention is that it did not use sand. That is to say, that it accomplished the same result without, as had been accomplished with sand; and it may be added that the same result was accomplished without the use of any non-carbonaceous material in the back of the plates by confining the carbonaceous material within the brick box, as set forth in the findings."

In view of the construction given to the contract of 1893 by the previous decision, we are of opinion that the court below did not error in deciding as it did that the circumstance that sand was used in the back of the plates in the various tests made by the Government to which reference has been made and was also employed in the treatment of the armor plate which was the subject of the suit decided in 196 U. S., while in the treatment of the armor plate involved in this suit neither sand nor any

other noncarbonaceous material was packed on the side of the plate which was not to be carbonized, did not entitle the United States to claim that the Harvey process of the contract of 1893 was not used. As said by the court below, the Government received all it had bargained for, since it was not only entitled by the contract to a disclosure of the inventor's process, but to his instructions and assistance in the practical application of the patent, and was at liberty to use the process, little or much, in whole or in part.

The unsoundness of the remaining contention becomes apparent from its mere statement. The proposition is that even although the armor plate made for the United States by the Midvale Steel Company was hardened by the Harvey process, the obligation to pay royalty as to such armor does not exist because the United States had not by its contracts with the Midvale Company specifically required that company to use the Harvey process. But under the terms of two of the contracts with the Midvale Company that company was permitted to use the Harvey process if desired, while under the other contracts the process used was required to be satisfactory to the Navy Department, and under all the contracts the United States had the right to inspect the process used. Under the contract of April 12, 1893, the right was conferred upon the United States to use and employ the "aforesaid Harvey process in the treatment of armor plates for vessels which have been since July 18, 1892, or which may hereafter be authorized by Congress, and to use and employ armor plates for such vessels manufactured according to said process, paying therefor to the party of the first part a royalty of one-half of one cent per pound of the finished plate." We think the plain meaning of the contract was that the Government should pay royalty when it used armor plate treated according to the Harvey process of the contract.

*Affirmed.*