### PRESSED STEEL CAR CO. v. UNION PAC. R. CO.

### SAME v. SOUTHERN PAC. CO.

(Circuit Court of Appeals, Second Circuit. December 22, 1920.)

Nos. 4, 5.

1. **Evidence ☞450(5)—License to use designs held unambiguous, so as to exclude evidence that unpatented designs were covered.**

A contract reciting that a car company was the owner of patents covering devices and designs used in the construction of freight cars, that a railroad company had used certain designs and patented devices owned by the car company and referred to in the previous paragraph, that it desired to arrange to build under royalty freight cars containing such designs and patented devices, and authorizing it to build freight cars containing the designs and devices covered by patents owned by the car company, and providing for the payment of a royalty, etc., *held* unambiguous, so that prior correspondence and conversations during the prior negotiations were not admissible to show that all of the car company's designs, whether patented or unpatented, were covered.

2. **Damages ☞40(2)—Evidence held to supply measure of damages for breach of contract, not unreasonable or conjectural.**

Where a license to a railroad company to use patented designs or devices in the manufacture of freight cars required such company, in contracting for the construction of cars outside its own shops, to give the patentee a preference at $10 per car in excess of the price bid by other car builders, evidence that the patentee, if given an opportunity to bid on cars, would have done so at the price offered by other builders plus $10, and would have built them at a profit, supplied a measure of damages not unreasonable or too conjectural to be admitted.

3. **Patents ☞211(1)—Recitals in license that licensee would not evade patent held contractual.**

A recital, in a license to a railroad company to use patented devices and designs in the construction of freight cars, that the railroad company had agreed not to evade or attempt to evade such patented devices, though contained in the preamble, instead of the body of the contract, was contractual.

4. **Patents ☞211(1)—Agreement by licensee not to evade patent does not support recovery, in absence of infringement.**

An agreement by railroad company, licensed to use patented devices and designs in the construction of freight cars, not to evade or attempt to evade such patented devices, merely meant that it would not resort to colorable differences of construction to escape infringement, and did not support a recovery, in the absence of proof of infringement.

5. **Patents ☞129, 211(3)—Licensee may refer to prior art to show noninfringement.**

While a licensee under a patent may not refer to the prior art for the purpose of showing that the patent is anticipated or invalid, he may do so to show that what he uses does not infringe the patent.

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**6. Patents ⊂⇒218(3)—Licenses held not to change general rule that royalty ceases on termination of patent.**

A license to a railroad company to use patented devices and designs in the construction of freight cars *held* not to change the general rule that liability to pay royalties terminates on the expiration of the patent.

**7. Patents ⊂⇒212(1)—Licensee held liable for royalty on freight cars constructed for it by another licensee.**

Where a license to a railroad company to use patented devices and designs in the construction of freight cars required it to pay a royalty of $10 on each car built or caused to be built by it, it was liable for such royalty on cars built for it by a third party, also holding a nonexclusive license from the patentee, notwithstanding the general rule that an article purchased of a licensee may be used and sold free of the patent.

In Error to the District Court of the United States for the Southern District of New York.

Two actions by the Pressed Steel Car Company against the Union Pacific Railroad Company and against the Southern Pacific Company. Judgment for plaintiff for an insufficient amount (254 Fed. 316), and it brings error. Reversed.

See, also, 240 Fed. 135; 241 Fed. 964.

Kiddle & Margeson, of New York City (John B. Stanchfield, Alfred W. Kiddle, Charles A. Collin, and Wylie C. Margeson, all of New York City, of counsel), for plaintiff in error.

Henry W. Clark, George Adams Ellis, and James R. Sheffield, all of New York City, and James I. Kay, of Pittsburgh, Pa., for defendant in error Union Pac. R. Co.

Gordon M. Buck, of New York City (G. A. Ellis, of New York City, of counsel), for defendant in error Southern Pac. Co.

Before WARD, ROGERS, and HOUGH, Circuit Judges.

WARD, Circuit Judge. This is a writ of error taken by the plaintiff Car Company to a judgment in its favor for $9,150.06 in an action tried by the court without a jury. The case of the Pressed Steel Car Co. v. Southern Pacific Railroad Co., exactly similar in point of law, was argued at the same time.

November 1, 1905, the Pressed Steel Car Company and the Union Pacific Railroad Company entered into the following contract:

"Agreement made the 1st day of November, 1905, between Pressed Steel Car Company, a corporation organized and existing under and by virtue of the laws of the state of New Jersey (hereinafter called the 'Car Company'), of the first part, and Union Pacific Railroad Company, a corporation organized and existing under and by virtue of the laws of the state of Utah (hereinafter called the 'Railroad Company'), of the second part:

"Whereas, the Car Company is *the owner of certain patents covering various devices or designs* used by the Railroad Company in the construction of 'common standard' freight cars, a partial list of which is enumerated in Schedule A hereto attached (but it may be that there are other devices or designs owned by the Car Company which are so used and are not specified in said schedule), which 'common standard' freight cars are known by the following type:

\* \* \* \* \* \* \* \* \*

"Whereas, the Railroad Company admits the use by it in the construction of its 'common standard' freight cars of *certain designs and patented devices owned by the Car Company*, and *referred to in previous paragraph, and admits* the validity of the patents embodied therein, and has agreed not to evade or attempt to evade said patented devices recited in the schedule hereto annexed, as embodied in its 'common standard' freight cars; and

"Whereas, the Railroad Company is desirous of making an arrangement with the Car Company whereby it may build or cause to be built, under royalty, *freight cars containing such designs and patented devices* for its own use and the use of the various railroad companies now or hereafter owned or controlled by it by the ownership of a majority of the capital stock therein or otherwise, or leased or operated by it, but not for sale; and

"Whereas, the Railroad Company has since the 1st of June, 1904, built and caused to be built 'common standard' freights cars *in which the devices covered by said patents of the Car Company have been used:*

"Now, therefore, in consideration of the sum of one dollar by each to the other in hand paid, the receipt whereof is hereby acknowledged, and the mutual covenants contained herein, and other good and valuable considerations, it is agreed as follows between the parties hereto:

"First. From the date of the execution of this agreement until the 31st day of December, 1914, the Railroad Company shall have a right and license to construct or have constructed for its own use and the use of the various railroad companies now or hereafter owned or controlled by it, by the ownership of a majority of the capital stock therein or otherwise, or leased or operated by it, and to use and to permit to be used by and upon the lines of the various railroad companies so owned, controlled, leased, or operated by it, *freight cars containing the designs and devices covered by patents now owned or controlled or which may during the said period be acquired, owned, or controlled by said Car Company:* Provided, however, that if the Railroad Company shall hereafter acquire the control of any railroad company by lease, ownership of a majority of the capital stock therein, or otherwise, it shall advise the Car Company of such control before the Railroad Company builds or causes to be built any cars for the use of such company.

"Second. For each car heretofore built or caused to be built by the Railroad Company since June 1, 1904 (except cars built by the Car Company or by the Western Steel Car & Foundry Company), known as 'common standard' freight cars, containing *certain of the designs or devices enumerated in Schedule A*, the Railroad Company agrees to pay to the Car Company within thirty days from the date of execution of this agreement, the sum of ten dollars ($10) per car in cash as a royalty.

"Third. For each car hereafter built or caused to be built during the period of this contract by the Railroad Company (except cars constructed for the Railroad Company by the Car Company or by the Western Steel Car & Foundry Company) *containing any of the designs or devices covered by patents now owned or controlled or which may hereafter be owned or controlled by said Car Company*, the Railroad Company shall pay as royalty to the Car Company, within ninety (90) days after completion of such car, ten dollars ($10) per car in cash.

"The Railroad Company covenants and agrees that at the expiration of two months from the execution of this agreement, and at the end of every succeeding period of three months thereafter during the life of this contract, it will furnish to the Car Company a correct statement of the number of freight cars which the Railroad Company has built or has caused to be built or ordered to be built during the said preceding quarter.

"Fourth. The Railroad Company hereby gives to the Car Company and/or to a corporation known as the Western Steel Car & Foundry Company, a corporation organized and existing under and by virtue of the laws of the state of New Jersey, and for which company the Car Company in this regard will act as agent, a preference (provided they can make reasonably prompt or similar deliveries, under the same plans and specifications) over any other car builders in the construction of any or all freight cars *containing designs and devices covered by patents now owned or controlled or which may here-*

*after be owned or controlled by the Car Company*, caused to be built by the Railroad Company outside of its own shops, at the price of ten dollars ($10) per car in excess of the price bid by such other car builders for the construction of any freight cars embodying such designs and devices; the Railroad Company, however, reserves the right to build such cars in its own shops, in which event the Railroad Company agrees to pay to the Car Company a royalty of ten dollars ($10) per car for each car so built.

"Fifth. It is further agreed that if the Railroad Company abandons its present 'common standard,' and adopts instead thereof a new design, which it contends does not embody any of the *designs and devices covered by the patents now or hereafter owned or controlled by the Pressed Steel Car Company*, and if such contention is disputed by the Car Company, then the question whether or not such new design does embody any design or device or patent owned by the Car Company shall, upon written request of either party to the other, be referred to two arbitrators—one to be selected by the Car Company and one by the Railroad Company—who shall proceed within thirty (30) days from the date of such written request; and if such arbitrators shall agree, then their decision shall be final. In case such arbitrators shall not agree within sixty (60) days after their selection, then the two arbitrators shall select a third arbitrator and the decision of a majority of the arbitrators thus chosen shall be final and binding on the parties hereto. The expense of such arbitration shall be paid by the party against whom the award is made.                                  Pressed Steel Car Company,
                                        "By F. N. Hoffstot, Pres.
                            "Union Pacific Railroad Company,
                                        "By W. V. S. Thorne, Director of Purchases."

We have italicized portions to be presently considered.

November 13, 1917, the Car Company filed an amended complaint containing three causes of action, in each of which it described itself as the owner "of certain letters patent of the United States covering various devices or designs relating to freight cars":

First, that between May 1, 1909, and December 31, 1914, the Railroad Company built or caused to be built 21,896 freight cars containing one or more of the Car Company's designs or devices upon which the Railroad Company became liable to pay the Car Company $218,960, which it has neglected and refused to do.

Second, that the Railroad Company had caused to be built 21,896 freight cars outside of its own shops embodying the Car Company's designs or devices, without notifying the Car Company of the prices bid by the other builders, and without giving it a preference, as agreed, to build the cars at those prices plus $10; that the Car Company could have built and would have built the cars at that price, and has been damaged in the sum of $1,094,800.

Third, that the Railroad Company between May 1, 1909, and December 31, 1914, had built 21,896 freight cars embodying designs or devices which were evasions of the Car Company's designs or devices, in violation of its agreement not to evade or attempt to evade the said designs or devices, to the Car Company's damage in the sum of $218,960.

As to all the cars the trial judge held that the patents relied upon by the Car Company had either expired or had not been infringed, except 700 work and 200 gondola cars, which did embody one or more of the Car Company's patented devices, and for these he awarded the Car Company judgment for royalties amounting to $9,000, with costs. To

the judgment the Car Company has taken this writ of error.

[1] Under the first cause of action the Car Company contended that the contract covered its designs, whether patented or unpatented, and offered to show this by correspondence and conversations during negotiations which led up to the contract and occurring after it was executed, which the trial judge excluded upon the ground that the contract is unambiguous and must be enforced as it reads. In this conclusion we concur.

The first preamble of the contract recites that the Car Company "is the owner of certain patents covering various devices or designs." The second recites that the Railroad Company admits the use by it of certain designs and patented devices "referred to in the previous paragraph." The third recites the Railroad Company's desire for an arrangement whereby it may build or cause to be built cars "containing such designs and patented devices." Then the first article covers "designs and devices' covered by patents now owned or controlled, or which may during the said period be acquired, owned, or controlled by said Car Company."

Obviously in this article and in the fourth and fifth articles the parties are speaking of exactly the same designs and devices theretofore mentioned as covered by patents. So in the amended complaint filed November 13, 1917, eight years after the contract was executed, the Car Company describes itself in each of the three causes of action as "owner of certain letters patent of the United States covering various devices or designs relating to freight cars." It is quite impossible, in the face of such unmistakable language in the contract and in the complaints, to admit prior correspondence or conversations to show that the Car Company's unpatented designs were intended to be covered. What ownership has it in its unpatented designs? Any one may copy them.

Counsel seem to rest its title upon the decision of the Supreme Court of Pennsylvania in Pressed Steel Car Co. v. Standard Steel Car Co. and others, 210 Pa. 464, 60 Atl. 4, in which the Standard Car Company was required to surrender to it certain original drawings and blueprints which it had loaned to railroad companies for which it was building cars, and which these companies handed to the defendant, a competing car-building company. This was a surreptitious and inequitable use by the defendant of property belonging to the plaintiff. Its title was confirmed in the actual pieces of paper, and not to the ideas expressed by them. All that was asked for, or was granted, was an injunction.

[2] As to the second cause of action, the trial judge refused the Car Company's offer to prove by its books and testimony of its officers that it could have built the 700 cars as to which it was given no opportunity to bid; that it would have done so at the price offered by the other car builders plus $10 royalty, and would have built them at a profit. We think this was error. Such proof, if the Car Company could have made it, would have supplied a measure of damages not at all unreasonable, nor too conjectural to be admitted. Obviously the preference promised was a property right, and the manufacturing profit was likely to be much larger than the $10 royalty. The contract did not contem-

plate that the Railroad Company should advertise for sealed bids, the lowest bidder to get the order. While it may not have been good business for the Railroad Company to tell the Car Company the amount bid by another builder and allow it to take the order at that price plus $10, still that was the contract. Under this cause of action the trial judge awarded 6 cents damages.

To support the ruling below, the Railroad Company relies solely on Laundry Co. v. Dolph, 138 U. S. 617, 11 Sup. Ct. 412, 34 L. Ed. 1083, and undoubtedly the resemblance between that litigation and this is very great. Nevertheless it is true that the principal subject or main purpose of the contract there in suit was to secure to one party a customer for its patented article, and for both parties a partnership arrangement by which they were to divide profits derived from manufacturing both the patented and unpatented articles.

It is certain that the Supreme Court itself regarded that portion of the Dolph contract which resembles the part of the agreement at bar now under consideration as subordinate and incidental to the "main purpose of the contract," and in applying the decision we have heretofore so treated it, saying that the Dolph Case held that—

"Damages could not be recovered for the breach of indefinite provisions in respect to an option in favor of one party as to a matter merely incidental and subordinate to the main contract." Allen v. Field, 130 Fed. at page 655, 65 C. C. A. at page 33, certiorari refused 201 U. S. 649, 26 Sup. Ct. 762, 50 L. Ed. 905.

The damages claimed in the Dolph Case were the profits Dolph would have made at "such price for other washing machines as may be bid for them in open competition for equal quality of goods by any responsible manufacturers other than said Dolph, and these prices shall constitute and be designated as the manufacturer's prices for these machines." The provisions in the instant case are much more precise, viz. the car is special, i. e., one embodying the Car Company's patented designs and devices, and the price is special, i. e., the price offered by a particular builder which the Railroad Company is willing to accept.

To the breach of such a contract we regard the later ruling of the Supreme Court in Hetzel v. Baltimore, etc., R. R. Co., 169 U. S. 38, 18 Sup. Ct. 255, 42 L. Ed. 648, as applying, and consider the more generous rule of damages there laid down strongly upheld by Dowagiac v. Minnesota Moline Plow Co., 235 U. S. 641, 35 Sup. Ct. 221, 59 L. Ed. 398, and Hamilton v. Wolf Bros., 240 U. S. 251, 36 Sup. Ct. 269, 60 L. Ed. 629. The court pointed out in the Hetzel Case that—

"In all civil actions the law * * * endeavors to give a just indemnity for the wrong done to the plaintiff, and whether the act was of the kind designated as a tort or one consisting of a breach of contract is on the question of damages an irrelevant inquiry."

And further:

"In using the words 'uncertain,' 'speculative,' and 'contingent,' for the purpose of excluding that kind of damage, it is not meant to assert that the loss sustained must be proved with the certainty of a mathematical demonstration to have been the necessary result of the breach of covenant by the de-

fendant; * * * certainty to reasonable intent is necessary, and the meaning of that language is that the loss or damage must be so far removed from speculation or doubt as to create in the minds of intelligent and reasonable men the belief that it was most likely to follow from the breach of the contract and was a probable and direct result thereof. Such a result would be regarded as having been within the contemplation of the parties and as being the natural accompaniment and the proximate result of the violation of the contract."

Nor is it an objection to recovery that the Car Company seeks to obtain compensation for loss of profits in allowing which it has been said that—

"No more definite or certain method of estimating profits could well be adopted than to deduct from the contract price the probable cost of furnishing the materials and doing the work." Guerini v. Carlin, 240 U. S. at page 280, 36 Sup. Ct. at page 307, 60 L. Ed. 636.

[3, 4] The third cause of action, based on the evasion clause, is contractual, though found in a preamble, instead of in the body of the contract. It expressly recites that the Railroad Company has agreed not to evade or attempt to evade said patented devices. Still we think that this is only another way of saying that it will not hereafter resort to colorable differences of construction with a view to escaping infringement. This cause of action was rightly dismissed, because no infringement was proved.

[5] Certain other errors assigned may now be briefly considered. We remain of opinion that, while a licensee under a patent may not refer to the prior art for the purpose of showing that the patent is anticipated or invalid, he may do so to show that what he uses does not infringe the patent. H. D. Smith Co. v. Southington Manufacturing Co., 247 Fed. 342, 159 C. C. A. 436. Therefore the trial judge was right in receiving such evidence.

The Car Company relies greatly on the case of United States v. Harvey Steel Co., 196 U. S. 310, 25 Sup. Ct. 240, 49 L. Ed. 492, decided January 16, 1905. That case has never been cited in any federal court, except in an opinion of the same court in an action between the same parties on the same contract, 227 U. S. 165, 33 Sup. Ct. 258, 57 L. Ed. 464, and in Smoot v. United States, 237 U. S. 38, 35 Sup. Ct. 540, 59 L. Ed. 829, upon another point. There was no reference to the prior art in either opinion. As to the Harvey Case, what the court held in the first case was that the government's defense that it was not using the patented process was bad, even though it used a lower heat in making armor plate than the patent called for, because it was using the process known as the Harvey process, which was the actual process it had contracted for. In the subsequent case the court remained of the same opinion, in face of the additional objection that the government, in making armor plate, omitted some of the elements called for in the patent.

Since the opinion in 196 U. S. 310, 25 Sup. Ct. 240, 49 L. Ed. 492, was handed down, it has been held that a licensee may refer to the prior art for the purpose of construing the patent, and of showing that what is complained of is not covered by it, in the Circuit Court of Appeals for the Second Circuit in Western Electric Co. v. Robertson et al., 142

Fed. 471, 73 C. C. A. 587, Standard Plunger Elevator Co. v. Stokes, 212 Fed. 941, 129 C. C. A. 461, Robinson v. Pay-As-You-Enter Car Corporation, 221 Fed. 943, 137 C. C. A. 513, and H. D. Smith & Co. v. Southington Manufacturing Co., 247 Fed. 342, 159 C. C. A. 436; in the Fourth Circuit in Leader Plow Co. v. Bridgewater Plow Co., 237 Fed. 376, 150 C. C. A. 390; in the Sixth Circuit in Babcock & Wilcox Co. v. Toledo Boiler Works Co., 170 Fed. 81, 95 C. C. A. 363; in the Eighth Circuit in Moon-Hopkins Billing Machine Co. v. Dalton Adding Machine Co., 236 Fed. 936, 150 C. C. A. 198; and in the Ninth Circuit in Leather Grille & Drapery Co. v. Christopherson, 182 Fed. 817, 105 C. C. A. 249. The conclusion is very strong that the Harvey Steel Case must be limited to its own particular facts and is not generally applicable.

[6] The trial judge was right in holding that the Railroad Company was not required to pay royalties on cars built after the expiration of the patent or patents relied on. Although the general rule is that liability to pay royalties terminates upon the expiration of the patent, the parties may contract to the contrary. We discover nothing in the contract to the contrary.

[7] September 22, 1909, four years after the contract of November 1, 1905, had been executed, the Car Company gave a nonexclusive license to the Bittendorf Company to make and sell cars embodying the Streib patent. The general rule is, of course, that an article purchased of a licensee under a patent may be thereafter used and sold free of the patent. Keeler v. Standard Bed Co., 157 U. S. 659, 15 Sup. Ct. 738, 39 L. Ed. 848. But the Railroad Company has agreed to pay $10 to the Car Company on every car "built or caused to be built by it," embodying any of the Car Company's patented devices, and though it may use cars bought of the Bittendorf Company, which has a license from the Car Company to make and sell cars embodying the Streib patent, it cannot escape its contract to pay the Car Company $10 each on 200 gondola cars which it caused to be built by the Bittendorf Company.

The judgment is reversed.