Booth, Chief Justice,
delivered the opinion of the court:
This is a patent case. The findings are quite voluminous and the case, notwithstanding the abnormal size of the record, not especially involved from the standpoint of facts.
The plaintiff is a skilled machinist; for over sixteen years he occupied a responsible position with the Bethlehem Steel Company in its gunshop department and had personal charge of tool making, sights, rifle heads, etc. In June, 1911, plaintiff became superintendent of the gun-finishing department of the Symington-Anderson Company, of Boch-ester, New York. This company was at the time engaged in manufacturing guns for the Government. Time was an essential factor in completing manufacture. The plaintiff conceived the idea of inventing a tool which would facilitate the performance of the “ rifling operation,” one which would not only improve upon the process then in vogue by way of accuracy but accomplish the purpose in much less time at decreased expense. The plaintiff disclosed his drawings *30 of the tool to another employee company Anderson, who was so impressed with its utility that he authorized an expenditure of $500 of the funds of the company to develop the invention. These events happened in July, 1917. On Thanksgiving Day, 1917, the tool was put through a practical test in the Symington-Anderson Company’s plant in the presence of five members of the company, was found to be operative, and with a few additional perfecting alterations was finally put in use about February 1, 1918. Thereafter all the guns manufactured by the Sym-ington-Anderson Company were rifled by this or substantially identical tools, and both the process and tool met the expectations of the inventor.
On February 23, 1918, the plaintiff filed his application for a patent for the tool and process of use. This was done at the instance and request of Mr. Anderson, who positively disavowed any claim upon or right to use the invention. As a matter of fact, the Symington-Anderson Company preferred no claim of license to use the tool or process.
At the time of filing the application for patent the applicant accompanied the same with a request to the commissioner to make it special. This request was predicated upon existing war conditions and the value of the tool and process. The commissioner refused to accede to the request. On June 29, 1918, the commissioner rejected all the submitted claims of the patentee, and followed his action on July 2, 1918, with a written injunction of secrecy upon the applicant. The commissioner’s secrecy order was promulgated under the act of October 6, 1917, and recited, among other things, “that your application as above identified has been found to contain subject matter which might be detrimental to public safety or assist the enemy in this present war, and you are hereby ordered to in no wise publish the invention or disclose the subject matter of said application, except that the invention may be disclosed to officials of the War and Navy Departments, but to keep the same secret during the period of the present war.”
The secrecy order of the commissioner was followed by a similar one from the Federal Trade Commission on July 2, 1918.
*31 upon the application of the plaintiff, authorized the use of the invention in the plants of the Symington-Anderson and Wisconsin Gun Companies. September 27, 1918, the plaintiff filed with the commissioner an amendment of his claims, supported by an argument as to their validity. On November 2, 1918, the commissioner, by an office action of that day, stated that plaintiff’s claims 1, 4, 10 to 14, and 17 to 18 were allowable in substance, the others being rejected. The plaintiff on November 8, 1918, responded with additional amendments and arguments. December 9, 1918, the War Department sought to intervene by filing with the commissioner a petition asking permission to take testimony to establish prior public use of the invention, and thus defeat plaintiff’s application. The commissioner did not rule upon the petition of the War Department immediately; instead, he did on December 10, 1918, rescind his previous order of secrecy, the Federal Trade Commission doing likewise on April 15, 1919. The commissioner finally decided the War Department’s petition in favor of the plaintiff May 29, 1919, and passed his application to patent June 27, 1919, issuing letters patent thereon No. 1311107 on July 22,1919.
On August, 17^1918, the plaintiff, through his attorney, tendered the invention to the Government. (See Finding XI.)
It is conceded by the defendant that the invention was used by the Symington-Anderson Company, the Wisconsin Gun Company, the Bullard Engineering Works, and the Bethlehem Steel Company. We think the concession is manifest; if not so, the proof establishes the facts indisputably.
We have recited in chronological order the facts covering the conception of the patent, its development, and the relationship of the patentee to the Government during the period involved, assuming for the instant the validity of the patent and its use by the Government. This has been done as a matter of first importance, made so by a defense advanced that under the present record the plaintiff has not established his eompl,iance with the provisions of the act of *32 October 6, 1917, and the trading with the enemy act of October 6, 1917 (40 Stat. 394), reads as follows:
Act To prevent the publication of inventions by the grant of patents that might be detrimental to the public safety or convey useful information to the enemy, to stimulate invention, and provide adequate protection to owners of patents, and for other purposes
“ Be it enacted by the Senate of the United States of America in Congress assembled, That whenever during a time when the United States is at war the publication of an invention by the granting of a patent might, in the opinion of the Commissioner of Patents, be detrimental to the public safety or defense or might assist the enemy or endanger the successful prosecution of the war, he may order that the invention be kept secret and withhold the grant of a patent until the termination of the war: Provided, That the invention disclosed in the application for said patent may be held abandoned upon it being established before or by the commissioner that in violation of said order said invention has been published or that an application for a patent therefor has been filed in a foreign country by the inventor or his assigns or legal representatives, without the consent or approval of the Commissioner of Patents, or under a license of the Secretary of Commerce as provided by law.
“ When an applicant provided and who faithfully obeys the order of the Commissioner of Patents above referred to shall tender his invention to the Government of the United States for its use, he shall, if and when he ultimately received a patent, have the right to sue for compensation in the Court of Claims, .such right to compensation to begin from the date of the use of tiie invention by the Government.”
While the applicable portions of the trading with the enemy act are not essentially different from the foregoing statute, we think it necessary to quote section 10 (i) (40 Stat. 422), providing as follows:
“ Whenever the publication of an invention by the granting of a patent may, in the opinion of the President, be detrimental to the public safety or defense, or may- assist the enemy or endanger the successful prosecution of the war, he may order that the invention be kept secret and withhold the grant of a patent until the end of the war: Provided, That the invention disclosed in the application for said patent may be held abandoned upon it being established *33 before or by the Commissioner of Patents that, in violation of said order, said invention has been published or that an application for a patent therefor has been filed in any other country, by the inventor or his assigns or legal representatives, without the consent or approval of. the commissioner or under a license of the President.
“When an applicant whose patent is withheld as herein provided and who faithfully obeys the order of the President above referred to shall tender his invention to the Government of the United States for its use, he shall, if he ultimately receives a patent, have the right to sue for compensation in the Court of Claims, such right to compensation to begin from the date of the use of the invention by the Government.”
The defendant’s analysis and construction of the statutes •are confined to the strict meaning of the language employed. The court is advised that jurisdiction is a subject of strict construction, and under the provisions of the jurisdictional acts it is clear that Congress did not extend relief to anyone save a patentee, and that the clause “when 'atí applicant whose patent is withheld” clearly means the suspension of an allowed application for a patent, the claim being made and insisted upon that the plaintiff herein had no more than a pending application for a patent which had not and did not reach the point of allowance, was in no condition to be allowed, until subsequent to the lifting of the commissioner’^ secrecy order, and hence it was impossible for, and the commissioner did not, withhold a patent. We need but mention that the statutes are intended as remedial ones in so far as the present cause of action is concerned. Congress under existing conditions was invading temporarily an established property right, and withholding from a class of inventors a statutory privilege of value, and unless it may be concluded from the ■enactments as a whole, together with the circumstances under which they were passed, that no inventor, save one who was entitled to a grant of a patent during the emergency, came within the laws the contention is unsound. The title •of the act of October 6,1917, discloses an intent to stimulate invention and afford protection to owners of patents. The provisions of the acts are in keeping with that purpose, and *34 the language employed in the first paragraph confers authority to withhold: a grant of a patent until the war is over. Patents are of course granted or refused upon the inventor’s application for a patent. From the application the commissioner obtains the information upon which the secrecy order is or is not to issue; he is not required by any provision of the statute to wait until he ascertains the issue of patent-ability before he enjoins secrecy. In this case he did not wait, but notwithstanding his rejection of all of the plaintiff’s first claims immediately warned the inventor to keep his invention secret and pointed out to him the consequences of disobedience of the order. It is the subject matter of the invention toward which the secrecy order is directed, a subject matter found in the application, and which but for the passage of the acts in question would become public if a patent were granted, that Congress was seeking to conserve for the exclusive benefit of the Government in time of' war.
The legislation accomplished a radical change in patent procedure, and substituting for the established practice a different course in procedure gave to the commissioner the right to suspend, to hold in abeyance, the granting of a patent until the emergency ceased to exist. This, we think, is demonstrated by the provision in the act of October 6, 1917, which says: “If and when he ultimately receives a patent,” language repeated almost in lime verba in the trading with the enemy act. This, we think, is a clear recognition of the right of an inventor subjected to the provisions of the act when his application is filed, to have a cause of action against the United States, if after tender of the invention the United States uses it, prior to the grant of a patent, when the samé-is 'ultimately granted. By force of the acts the inventor parts with an immediate right to apply for a foreign patent, loses the privilege of selling a trade secret, and gains the right to sue the United States for the use of an invention, if the application therefor ripens into a patent, a right the inventor would not have without the enabling provisions of this war legisiation. To hold otherwise would be equivalent to ascribing to Congress an intent to discourage rather than *35 stimulate invention. Congress was conferring upon the commissioner a discretionary power, exercisable upon the ascertainment from the inventor’s application for a patent whether the subject matter of the invention was such as to afford aid to the Government’s enemies. If he so found, and enjoined secrecy, the inventor was severely penalized if he failed to observe the inhibition. Manifestly, if the disclosures of the application for patent lacked novelty and invention, the applicant lost nothing; if, on the other hand, a grant of a patent followed, the inventor lost no rights by reason of the secrecy order and the withholding of letters patent. The commissioner’s administration of the law was in harmony with this construction, and he set up a committee, aided by the advice of Army and Navy officers, to whom applications for patents were submitted, and upon whose judgment he relied in issuing secrecy orders prior to examination as to patentability. (See amendment to rule 15 of practice of the Patent Office, set out in Finding VIII.)
It is next contended that the plaintiff did not observe the secrecy order, but on the contrary made his invention public. If this fact is established it is fatal to a recovery; at least this court has so held in the Zeidler case, 61 C. Cls. 537. The secrecy order was issued July 2, 1918; prior to this date, as the findings show, the invention, with the knowledge and acquiescence of plaintiff, was used in the Symington-Ander-son plant where the plaintiff was employed, and was known to the persons who were present on Thanksgiving Day, 1917, and to the workmen in the plant engaged in rifling guns, as well as to the Army inspectors stationed at the plant to inspect the finished guns. As a matter of fact, the invention was continuously used at the above plant, both before and after the permission to so use it was granted by the commissioner. The above use, we think, is covered by the commissioner’s permission to so use issued August 18, 1918. (See Finding VIII.) Permission was also granted for the use of the invention by the Wisconsin Gun Company on the same day and the plaintiff was authorized to disclose the invention to officers of the Army and Navy. The plaintiff himself, as the record establishes, did not disclose the invention pub *36 licly; he did disclose it to his employers, but aside from this he made in good faith an effort to maintain secrecy. The first experimental test of the invention was conducted on Thanksgiving Day, 1917, a national holiday, when the plant of his employers was closed to all except the plaintiff, Mr. Anderson, and such employees as were essential to conduct the test. The superintendent of the Symington-Anderson plant issued orders to keep the invention a secret. The plaintiff absolutely declined to accede to requests for a disclosure of the invention, and there is nothing in the record which in any way connects the plaintiff with a publication of the invention. On the contrary, he filed his application for a patent promptly after the operativeness of the device was demonstrated. On February 23, 1918, he petitioned for special consideration of the same, and when after the issuance of the secrecy order he discovered others than the Symington-Anderson Company using his invention, he called it to the attention of the Government officials. (See Findings VII and XI.) The plaintiff did not apply for a foreign patent, nor did he attempt to realize profit from the device as a trade secret. The Symington-Anderson Company had a shop license to use the device, and plaintiff was in no position to forestall them; nevertheless the company cooperated with him in this regard.
Knowledge of the patent did obtain prior to the secrecy order. The Wisconsin Gun Company, the Bullard Engineering Works, and the Bethlehem Steel Company obtained it and used the device, but nowhere does it appear that the plaintiff was responsible for the use. When the existing situation is taken into account it is not difficult to ascertain the source of knowledge as to the invention, entirely aside from the inventor revealing anything about it. The invention was a valuable acquisition for gunmakers, and its use, both permissive and otherwise in the Symington-Anderson plant, necessarily opened an opportunity for knowledge concerning it. Government inspectors, Army and Navy officers, were, under the contracts to manufacture guns, constantly present in the gunmakers’ plants; workmen were, of course, familiar with the invention, and it- is obvious that under the *37 necessities of the case the invention and its worth would leak out. This is signally illustrated by a letter dated July 16, 1918 (Finding X), in which a major of the Army requests the Symington-Anderson Company to disclose the invention to a mechanical engineer of the Bullard Engineering Works, a request which was promptly refused. It is not always difficult to draw inferences from events, but we have been unable to find from the record that the plaintiff failed to obey the secrecy order. For the incidental publicity resulting from use in the Government service we think the plaintiff is irresponsible. We think there is a marked difference between this case and the Zeidler case, supra. Zeidler made no efforts toward secrecy; he realized profit from the start; devices embodying his invention were sold in large quantities. Here the inventor never resorted to a similar practice.
The patent in suit is described in detail in Finding IX. The novelty of the tool as abstracted from the claims resides in its ability to simultaneously cut the rifling grooves in the bairel of a gun by forcing through it one at a time a series of circular disks having their periphery arranged in tooth-like formation, and of such proportions as to correspond to the desired rifling grooves. This is accomplished by utilizing first a disk so constructed as to make a slight cut and following this operation by a series of additional disks, each one of which in order makes a slightly deeper cut, until the desired rifling is completed. It is a graduated process, each disk so constructed as to penetrate deeper into the barrel of the gun until the desired grooving or rifling of the same is attained. The various disks are constructed for interchangeable yet precise mounting on a tool holder, easily removable after they have been forced one at a time through the gun barrel by the rifling bar. By thus utilizing them one at a time, cooling of the interior of the gun barrel between cuts is permitted, which would not be the case in certain of the prior art structures in which the use of a tool having an integral series of cutting disks of increasing diameter is suggested. There is a pilot or guard member mounted in front of the disk, which cooperates with a guide *38 sleeve at the rear of the disk in order to even stability and guide the disk during its course through the gun. The rifling bar, an indispensable element of the tool and process, was so constructed as to provide for rotation to the desired twist as it was forced through the gun barrel and suitable methods of lubrication in front of the cutting disks obtained. The tool and process resulted in a pronounced acceleration of the rifling process, and did in fact revolutionize the operative devices then in use. It likewise made available a means of effectually removing the “ shavings ” due to cuttings, a source of trouble theretofore. The record sustains the fact that previous to the patent in suit the rifling of guns had been from an early date accomplished by what is termed “ the adjustable cutter type of head,” a machine described in Finding XII. Without going into its detail of construction, we think it sufficient to state that the plaintiff’s tool and process, known as “the broaching type of head,” was so far superior to the old type that it at once superseded it and found immediate and practically universal use, as well as commercial value. The old type involved a multiplicity of operations, did not as successfully overcome the removal of “ shavings,” and consumed a longer time, as well as additional labor, to accomplish the purpose.
The plaintiff’s rifling head is an ingenious device; it combines the essential functioning elements in a way that has not been done before, and as to method of operation introduces for the first time successfully the accomplishment of rifling a gun barrel by forcing through one at a time the cutting disks. The importance and value of the result are not to be minimized. By the use of plaintiff’s device and method unskilled labor was made available; time was conserved and expense greatly reduced. What, however, is of still greater importance was the attainment of accuracy in producing rifling grooves.
The defendant does not seriously dispute the value of plaintiff’s tool and method. That it was generally adopted and used is indisputable. Prior use of a similar device is relied upon as anticipatory of the plaintiff’s invention. The difficulty with the citations of prior use offered is that, apart *39 of construction, which are manifest, two of the tools were used but a single time and thereafter abandoned. As appears from Findings XX and XXI, some time in 1901 the Washington Navy Yard constructed a miniature model gun, an exhibit in the case, and the gun barrel was rifled by a tool possessing some of the elements utilized by the plaintiff. The rifling was for appearances only, was completed by a single passage of the tool through the gun barrel, and was never thereafter used at all. In 1913 the Bethlehem Steel Company did almost precisely the same thing. It would be idle to contend that the “ broaching heads ” used upon these occasions in a small model gun anticipated the patent in suit; they were obviously employed to simulate real rifling in a full-sized gun, without either thought or interest in the attainment of the real purpose of effective rifling in operative guns, and never resorted to thereafter. Whatever may have been their value in substantial gun manufacture was lost to the art by abandonment, and the proof fails to sustain their use as an actual experiment. It was no more than a mere casual mechanism designed to accomplish the single purpose in hand, and subsequently discarded. (See Robinson on Patents, Vol. Ill, foot of page 211.) The same observations apply to the use made of the broaching head employed by the Bethlehem Steel Company in 1910 (Finding XXII), with the additional weighty fact that the drawing relied upon to disclose constructional features was made in 1920 from memory. Six guns were rifled by this alleged method and with the tool described; no subsequent use is shown and no claim is made of any subsequent use whatever.
Ten prior-art patents are cited as anticipatory; from them the defendant deduces a defense that the construction of the tool and the conception of the method for its use did not involve invention and was no more than the employment of mechanical skill. The art as demonstrated by its history involved certain fundamental necessities to meet which required the employment, in combination, of elements whose functioning capacity was well known and firmly ■established. It, of course, did not require the exercise of *40 invention to employ blades to cut; to for a partial twisting movement in projecting them through the barrel of the gun; to overcome the heat generations of friction, etc., etc.; everyone skilled in the art recognized the existence of all these difficulties in the rifling process. The problem to be solved was to combine into a workable mechanism these various instrumentalities at the command of the inventor and utilize their functioning capacity to accomplish in an effective way what the art demanded. The rifling of a gun barrel, as previously observed, was an exacting operation; rifling grooves are fixed with acute nicety; their dimensions and depth must accord with the charge to be discharged from the gun, and, as the art discloses, inventors for a long period of time were centering their attention upon the construction of a tool and method to do this identical thing. It is difficult in many instances to distinguish between mechanical skill and invention, but we are impressed here with the fact that the plaintiff did bring into existence a device, a tool as it is termed, which for the first time assembled into a mechanism each of the elements necessary to accomplish rifling in a decidedly new and novel way. The plaintiff’s invention overcame with success the-disposition of troublesome shavings; it provided a new method of lubrication; it furnished a period of cooling time for heat generated by friction incident to incisions in hard metal; it attained accuracy; it greatly facilitated the operation; reduced expense, and constructed a tool which could be operated by unskilled labor; all this and perhaps more was the result of the plaintiff’s conception. This, we think, required more than mechanical skill; it goes beyond a mere joining of elements old in the art, to do what everybody in the art knows they will do in an imitative effort, and involves a concept, creative genius, and the utilization of old elements in a new combination which obliges them to function in an entirely new and novel way to accomplish the difficulties towards which the invention is directed. (Robinson on Patents, Vol. I, section 78, and succeeding sections.)
We have said the foregoing for the reason that the prior art cited as anticipatory is “spotty”; no single citation *41 embraces plaintiff’s conception or tool. Each exhibits some single element of the invention in suit, an element recognizable as indispensable in any device, but there exists no suggestion that previous inventors comprehended the possibility of doing what the plaintiff did do. Aside from the crudeness of some of the inventions, it is apparent from the record that no one citation relied upon found a favorable reception in the art, or attained a degree of recognition commensurate with the plaintiff’s patent. No similar tool complete in all its parts appears. As a matter of proven fact, the invention in suit was the first in the field capable of rifling the barrel of a gun in the manner and under the conditions the art had been struggling to attain.. The case in this respect, we think, falls within the decision of the Supreme Court in Parks v. Booth, 102 U. S. 96, and United States v. Bethlehem Steel Co., 258 U. S. 321.
The Supreme Court in the case of the Richmond Screw Anchor Co. v. United States, 275 U. S. 331, had before it a patent case similar to the one in suit. In disposing of a contention made by the defendant that what the patentee did was merely the exercising of mechanical skill and not invention, the Chief Justice said:
“ It is argued, on behalf of the United States, that Lenke’s invention was unpatentable because it embodied nothing more than a natural and normal modification of existing ideas. Such modifications and their advantage were all very clear after the fact; but the old beams had been in use for a number of years and a heavy weight of metal had been used when, by Lenke’s device, it was cut down two-thirds. Lenke’s cargo beam almost universally superseded the old one. The United States used it and it was installed in nearly every pier in the country. No one else had foreseen its advantage. Lenke offered it as a solution of the problem at a minimum cost with a maximum efficiency. The United States conceded in the Court of Claims that Lenke’s patent was novel in the sense that there was nothing in the prior art exactly like it, and that it was useful. While thus, in a way, he improved an existing idea, he developed a new idea.”
We think this quotation is applicable not alone upon this one subject but that the opinion from which’ it is quoted applies generally to the question of invention in this case.
*42 We have set forth the prior-art citations relied upon in the findings, and think it hardly necessary to review each one in detail. The invention, in our opinion, comes within the principle of patent law stated by the Supreme Court in the case of Loom Co. v. Higgins, 105 U. S. 580. In this case the court said:
“It may be laid down as a general rule, though perhaps not an invariable one, that if a new combination and arrangement of known elements produce a new and beneficial result, never attained before, it is evidence of invention. It was certainly- a new and useful result to make a loom produce fifty yards a day when it never before had produced more than forty; and we think that the combination of elements by which this was effected, even if those elements were separately known before, was invention sufficient to form the basis of a patent.”
August 17, 1918, the plaintiff’s attorney addressed to the Secretary of the Navy the letter appearing in Finding XL The defendant, construing the act of October 6, 1917, literally asserts that this communication is valueless as a tender for use, first, because it is not in accord with the terms of the act; and, secondly, the record does not disclose that the use which followed was the direct result of the tender or a use by the United States. As to the first contention the second paragraph of the statute does use the words, “ When an applicant whose patent is withheld as herein provided.” This sentence standing alone would support the argument advanced. The plaintiff’s application had not then been granted; nevertheless, as we have previously observed, we think this is too narrow a construction of the statute. Congress was not primarily concerned in affording protection to an inventor whose application had passed to issue; the context of the statute as a whole negatives this intent. The act afforded relief to inventors whose right to a grant of patent was suspended and had no intention to restrict the right to sue for compensation to those who had procured a grant of a patent. To so hold would limit the benefits of the act to that class of applicants who had been fortunate enough to have their applications, filed during the period, immediately considered and passed to issue, and leave without relief tho *43 more numerous class whose applications were necessarily delayed or retarded by the many obstacles which may interfere to prevent immediate grants, as well as to ignore the congestion obtaining in the Patent Office during this period. It seems clear to us that Congress by inserting the words “ whose patent is withheld ” used the word “ patent ” as synonymous with invention, i. e., whose grant is withheld, and did not mean to exclude an applicant whose right to a patent was a matter of future determination. The report of the Senate Committee on Patents clearly indicates that Congress intended to compensate inventors for the use of their inventions during the war. (Senate Report No. 119, 65th Cong., 1st sess.)
As a matter of proven fact the plaintiff’s patent in the common acceptation of patent practice was withheld, for on November 2, 1918, the commissioner advised him that claims 1, 4, 10 to 14, and 17 to 18 were allowable in substance, and these claims with some additional amendments finally passed to patent June 21, 1919. The purpose of a fender for use by the Government is obvious. Notice of the inventor’s application and claims afforded the Government opportunity to use the invention or refuse its use, but, says the defendant, the use in this case was not by the United States, nor did it follow as a consequence of the tender. Its use, it is said, was but the continuation of the use of an unpatented suggestion already known and in use by Government contractors. The terms of the act of October 6, 1917, providing for compensation for use, are comprehensive, “ such right to compensation to begin from the date of the use of the invention by the Government.” Let us take the record in this case in this respect. Secrecy is enjoined upon the patentee. We have found the secrecy order to have been observed. The patentee discovers that his invention has become known to and is in use by Government contractors other than those who have permission to use it; he at once notifies the Government of this use and at the same time tenders his invention for use. The Government contractors thereafter continued the use of the invention. *44 Surely opportunity was afforded the Government by the tender to discontinue its use. It was but a formal matter for the Government to notify the contractors of plaintiff’s tender and claims. On the contrary, with full knowledge of the situation the Government at no time did more than to attempt after use to prevent the granting of plaintiff’s patent. The officers of the Government knew the law and were conscious of the legal consequences of using the invention if they continued to use it. What were those consequences? One at least was a liability to compensate the patentee for the use of his invention from the date of the use. The Government may not disclaim knowledge of the invention, nor of the plaintiff’s future .intention to seek compensation. The plaintiff had permission to use the invention and disclose it to his employers and one other company. Therefore it seems to us that the unauthorized use preceding the tender, if continued after the tender, brings the plaintiff within the relief intended by the act.
The final defense upon the issue of user is, indeed, more troublesome. The defendant contends that the use of an invention or, as we may say in this case, an incomplete patent by an independent contractor, of his own volition, without any requirement upon the part of the Government to use the invention, entails no liability upon the Government to pay for such use. In the contracts involved in this case there are no provisions requiring the contractors to use this or any other patented device. The contractor was at liberty to choose his method of rifling the guns, and beyond peradventure there was available another method by which rifling could be successfully accomplished. So that in its final analysis the defense is made to rest upon the proposition that the use in this case was for and not by. the "United States, as the act contemplated, and that the use was not required of the contractors by the United States. An independent contractor under no contractual obligations | to use a specific patented device may not in his agreement j with the United States relieve himself from liability as an infringer of a patent because of this contractual relationship. *45 Cramp case, 246 U. S. 28. The plaintiff predicates bis right of recovery upon the peculiar character of the contracts in the case and insists that a cost-plus contract, such as were the contracts here involved, entitles him to invoke the principle “ facit per alium, facit per se.” The contracts with the Symington-Anderson Company, the Wisconsin Gun Company, and the Bullard Engineering Works, all substantially similar, obligated the Government to pay for the plant, equipment, materials, and tools, up to a stated amount, the contractors to be rewarded upon a fixed-profit basis, except the Bullard Engineering Works, ,in which case the compensation was fixed at cost, plus $1,000 for each gun. There were many such contracts entered into during the war, and in the contracts to which this controversy is addressed the inducement to undertake the enterprise was quite complete and generous. In the case of the Bethlehem Steel Company no such financial provisions obtained. It was a distinct cost-plus contract. If, of course, the contractors were agents of the Government, this phase of the contention would be free from difficulty. However, we are not prepared to hold that the financing of an undertaking wherein the contractor obligates himself to manufacture a specific thing, makes him, under the provisions of the contracts here involved, an agent of the Government to the extent at least of holding the Government responsible for the use of a patent which the contractor was at liberty to use or not to use, as his judgment dictated.
In so far as the contractor and the Government are concerned, two stipulations in the contracts absolved the Government from any liability for the unauthorized use of a patent by the contractor. The plaintiff, however, in addition to the above contention, insists that, as a proposition of law, compensation for use follows from the use by the contractor of the patent in suit, with the knowledge and acquiescence of the Government, and fortifies this contention with a statement that the record shows that the authorized Government officers in charge of the contract knew of the use made of the invention, not only acquiesced therein but encouraged its use, recommended to all the contractors *46 it be from which the tools were made, paid for the guns in which was used, and now owns as salvage from the plant and equipment the tools which were so used. While the question is not free from doubt, we are inclined toward the opinion that the argument is tenable. The contracts contained numerous provisions under which the Government inspectors, through the Chief of Ordnance, were clothed with plenary authority to reject any unsatisfactory detail manufacture, and the contractors’ compensation was dependent upon the guns meeting inspection. Not only was this supervisory authority exercised to the limit, but the plants of the contractors were closed to visitors, except upon permission of the War Department. Time was a most important factor, made so in the contracts; all allowable haste was important; the need for ordnance was acute, and, we think, the inspectors and those in authority were more than pleased with the advent of plaintiff’s tool and process. The inspectors could not escape knowledge of use; they were present from day to day and observed the process of manufacture. The Chief of Ordnance, on December 10, 1918, granted written permission to the French High Commission, then in this country, to acquire information as to and afford aid in gunmaking, to visit the Symington-Anderson plant and inspect the method of rifling employed. The first paragraph of the permit, after reciting a request therefor, used this most significant language, two words of which we italicize: “ In order to study out methods of rifling, examine the machines used, and collect photographs and other documents pertaining to this process.” We find nothing in the record indicating a lack of knowledge or acquiescence in the use of the invention for the Government by the contractors; in fact, no claim of ignorance in this respect is made. When the Government sought to forestall the granting of a patent, as it did on December 9, 1918, prior public use and no other cause was assigned as a lawful reason for withholding the grant.
porting the plaintiff’s contention. The nearest approach to *47 issue, in cases cited in the briefs, is found in the case of United States v. Harvey Steel Co., 227 U. S. 165, 172. In disposing of this case the court said:
“ The unsoundness of the remaining contention becomes apparent from its mere statement. The proposition is that even although the armor plate made for the United States by the Midvale Steel Company was hardened by the Harvey process, the obligation to pay royalty as to such armor does not exist because the United States had not by its contracts with the Midvale Company specifically required that company to use the Harvey process. But under the terms of two of the contracts with the Midvale Company that company was permitted to use the Harvey process if desired, while under the other contracts the process used was required to be satisfactory to the Navy Department, and under all the contracts the United States had the right to inspect the process used.”
In Wood v. Atlantic Gulf & Pacific Co., 296 Fed. 718, 722, 723, the district court, in refusing to modify an injunction at the request of an infringer, a motion so to do being predicated upon a partial use by the Government under the acts of June 5, 1910, and July 1, 1918, said:
“ When the Government knows and obliges the contractor to use the patented article, of course the Government should be willing to pay; but it will be going entirely too far to say that, because any independent contractor for his own convenience saw fit to use the patented article in doing Government work, the Government should pay for such use by him, when they did not know he was using it.
* * * * * * *
“ The same analysis of this language shows with the same conclusiveness that it does not indicate the use by an independent contractor in doing the work for the United States, where such use was not with the knowledge or by the requirements of the United States. I am therefore of the opinion that, if the facts before the commissioner show that this defendant had a contract which required certain dredging operations to be done by it for the United States, without further showing that the United States either required the use by the contractor of the Wood runner, or had knowledge that the Wood runner was to be used or was being used by defendant in doing this dredging operation, the act does not affect such use, and the commissioner will proceed just the same as if the act had never been passed.”
*48 The construction of the act of July 1,1918, Court in the Richmond Screw Anchor case, supra, discloses the intent of Congress in affording relief to patentees for the use of their inventions by contractors for the United States. We perceive no valid reason for ascribing to Congress a different intent in the passage of a war measure obviously enacted to cover an existing situation, such a one as prevailed when the act of October 6, 1911, was passed. In extending relief to inventors whose inchoate right to a grant of patent precluded a cause of action for use of the same by the Government, Congress was not dealing in technicalities, nor intending to preclude a cause of action if the Government knew, consented, and profited by the use for it of an invention under the circumstances fixed in the act.
The use of the plaintiff’s invention was indeed beneficial to the Government. It not only saved a most considerable sum of money on a cost-plus contract, but expedited the manufacture of guns, and accomplished what had never been accomplished before in a concededly efficient and perfect manner. For tools or mechanism to do this thing was in fact exactly what the War Department wanted, and the record sustains the fact that when it was found, the department, fully aware of its use, not only acquiesced in the same but encouraged it and in the end profited to a most considerable extent thereby. It is inconceivable that any other course would or could have been pursued.
The plaintiff may not recover for the use of his invention by the Symington-Anderson Company. This, we think, is apparent from the record and the decision of the Supreme Court in Gill v. United States, 160 U. S. 426, as well as numerous other precedents to the same effect, too many in fact to warrant citation.
There is no proof in the record upon which a judgment can be predicated for damages. The case will therefore be remanded in accordance with the stipulation of the parties for proof on damages. It is so ordered.
GREEN, Judge; and Moss, Judge, concur.
Graham, Judge, took no part in the decision of this case.