## KANT-SKORE PISTON CO. v. SINCLAIR MFG. CORPORATION.

Circuit Court of Appeals, Sixth Circuit. June 6, 1929.

No. 4991.

F. O. Richey, of Cleveland, Ohio, and Leonard Garver, Jr., of Cincinnati, Ohio (William L. Symons, of Washington, D. C., and David Lorbach, of Cincinnati, Ohio, on the brief), for appellant.

Marston Allen and Sanford A. Headley, both of Cincinnati, Ohio (Allen & Allen and Buchwalter, Headley & Smith, all of Cincinnati, Ohio, on the brief), for appellee.

Before DENISON, MACK, and HICKS, Circuit Judges.

MACK, Circuit Judge. Suit for specific performance of a patent licensing agreement.

Patent No. 1325176 was granted December 16, 1919, to A. A. Spillman for an improvement in internal combustion engines. The object of the invention was to make practicable the substitution of aluminum for cast iron in pistons because of the substantial advantages in weight. This had theretofore been impracticable due to the fact that aluminum pistons expand under the heat of operation twice as rapidly as the cast-iron engine cylinders containing them and thus tend to score the walls thereof. Spillman cut through the skirt, or depending cylindrical portion of the piston, two transverse slits near the head and two diagonal slits spiralling down from the transverse slits to the bottom edge of the skirt, thus forming disconnected oppositely tapering tongues. The primary function of the slits undoubtedly was to take up the expansion attendant upon heating without change in size or cylindrical form of the piston; but it is asserted both in patent application and by the witnesses that the slits also serve to make the piston sides so resilient that the pistons can be fitted into the engine cylinder with very small clearance and yet be relied upon to spring back just sufficiently to permit easy passage when forced against the cylinder walls by the pressure of each stroke.

While the application was pending, Spillman gave an exclusive license on a small royalty to Sinclair and Hallstead, who formed the Sinclair Manufacturing Company, plaintiff herein. Plaintiff produced and marketed the pistons to an extent not clearly shown by the record, except that it

was more than negligible. The name "Kant-Skore" was applied to the pistons, being used then and later, as the trial court properly found, to designate the type of article rather than the source of its origin, by calling attention to its principal virtue.

On May 15, 1920, plaintiff entered into a contract with one Armstrong, whereby it assigned through him to his corporation, the Walton & Macke Nail Company, all of its rights under the patent, and the assignee agreed to pay plaintiff "royalties in the sum of thirty-five cents for each and every piston, excepting as hereinafter specified, manufactured and sold in said territory under said patent right by second party or his assigns, respectively, under and pursuant to this agreement." There were elaborate provisions for defense of the patent, and the assignee further agreed "to diligently proceed to make an organization and arrangements for the manufacture of such pistons and the distribution thereof in the best centers of said territory. * * *" The assignee was given an option should it at any time decide that the patent was not of practical commercial use, to terminate the contract on ninety days notice, upon the surrender by it of all the rights therein granted. Later clauses provided that the assignee should pay at invoice prices for all the machinery and equipment of plaintiff's factory, and that, "Party of the first part further grants unto second party and his assigns, the exclusive right to use the name and trade-mark 'Kant-Skore,' which said trade-mark has been copyrighted by first party, and first party now licenses second party and such assigns to use said trade-mark in connection with the manufacture and sale of said pistons as herein provided."

Pursuant to the condition precedent in this contract requiring consent by Spillman, the inventor on May 20th entered into an agreement with plaintiff and plaintiff's incorporators in which he gave his assent to that and to future transfers of the license, in consideration of a royalty to be paid him by plaintiff of 5 cents per piston with a minimum of $250 per month. Royalties were payable upon the 25th day of each next succeeding month; if not paid within a month thereafter Spillman could give notice to plaintiff, and all assignees and sublicensees of whose interest he had written notice, that the agreement and all rights thereunder would be canceled in 60 days in default of payment by plaintiff or an assignee, and if the payment were not so made then the agreement would "cease and determine" on the designated day.

Spillman agreed to disclose and subject to the license any further improvements in connection with the piston he might discover.

During the succeeding year large quantities of "Kant-Skore" pistons were marketed by the nail company. Harry Hater, a Cincinnati shoe dealer, became its local representative and shortly thereafter induced a wealthy relative to buy the business and establish him therein. Accordingly, a new corporation, defendant Kant-Skore Piston Company, was formed by Hater and Armstrong. In May, 1921 there were assigned to it, in consideration of cash, notes, and the assumption of liabilities under Armstrong's contract of May 15, 1920, all of the nail company's rights under all of the above contracts in respect to the patent, as well as the assets, accounts, and good will of the business. Defendant gave Spillman notice of its rights so as to become entitled to any notice from Spillman of any breach by plaintiff of the May 20th agreement.

Defendant at first suffered losses in its operations, amounting to $106,000 by the end of 1921, but thereafter its business steadily improved until the Kant-Skore aluminum piston won a very important place in the industry, due in large measure to effective advertising of the trade-name.

The first months after the transfer to defendant were marked by widespread protest by dealers that a substantial percentage of the pistons were defective, in that after a period of use the tongues formed by the juncture of the spiral and transverse slits were bent in, especially, as examination is said to have disclosed, on the side of the skirt receiving the thrust of the power stroke, until the piston became distorted in shape and at places the clearance between the piston and the engine cylinder wall was far too great. Plaintiff contends, and as the trial court found at least to some extent rightly, that this caving in of the piston under pressure was due to the use by defendant in the early months of exceedingly soft low-grade metal. But defendant strenuously insists that the weakness resulted from an inherent error in the Spillman construction, namely, inclusion of the spiral slit across that side of the piston skirt bearing the brunt of the power stroke. Although the Sinclair Company had experimented with pistons slit only on one side and had marketed a few, this departure from Spillman was discouraged by him and, so far as the record shows, was not communicated to defendant. Hater, inexperienced as he was in piston mechanics, attempted by trial and error to remedy the

defect complained of by the dealers and finally evolved a construction modifying Spillman in two respects: First, on the thrust side the metal was not cut wholly through at the bottom of the skirt so as to produce the spiral slit but instead was merely grooved by a spiral slot backed up by the uncut inside reinforcing ring; second, this slot was stopped short of juncture with the transverse slits, thus eliminating the tongues of metal on the thrust side. In other words, Hater stiffened and strengthened the piston where it had to sustain the greatest pressure, and eliminated the metal tongues most likely to cave in, but in so far as the diagonal slot was useful to permit expansion of the piston wall in all directions in its plane, defendant's new form only impaired the full effect of Spillman's form. These changes were evolved early in 1922; application was forthwith made for a patent, which was granted February 26, 1924, No. 1,485,078.

Immediately in 1922, defendant discarded its stock of old type pistons and sold only the new, informing the trade of the asserted improvement. It continued, however, not only to sell its product under the name "Kant-Skore" and to mark its goods "patented," but also to account to plaintiff for royalties thereon. It appears that about the time the new type was developed the parties agreed to a royalty of 11½ cents instead of 35 cents, for reasons not apparent from the record.

Previously, in August of 1921, finding that the recital in the Armstrong contract of the copyrighting of the mark "Kant-Skore" was erroneous, defendant applied for registration, claiming use since August, 1919, the date when plaintiff began business. Plaintiff intervened to ask registration in its own name, but in April, 1923, conceded priority after being advised it is claimed, of defendant's superior rights under the contract then subsisting.

In the winter of 1923, just before the Hater patent issued, defendant without notice of any kind ceased paying royalties. Throughout the prior years of the contract, delays in payment had been frequent. Each time one occurred Spillman sent to all the parties the notice of termination provided for in his contract with plaintiff, and defendant thereupon made payments directly to him; defendant indeed seems to have desired these notices in order to avoid having to rely upon plaintiff paying Spillman; at all events, Hater testified that such notices were so frequent that he was accustomed to treat them as "notices to pay up." But when on March 27, 1924, shortly after issuance of the Hater patent,

Spillman sent a notice with respect to the arrears for November, December, and January royalties due from plaintiff, notifying each of the parties that unless paid within 60 days, the "said agreement and all rights thereunder will be cancelled," defendant did nothing until the last day of the 60 days' grace allowed by the notice, and then it sent only a $250 check as minimum royalty for the month of November. To a letter of June 2d, by Spillman's lawyer asking payment of the full amount due and stating that meanwhile Spillman did not want to cash the check because that would "kill the notice," and to subsequent letters by Spillman asking accounting for later months, defendant made no answer; it continued its business in all respects as heretofore described, except that its use of the word "Patented" was now justified by the newly issued Hater patent.

Defendant accordingly sets up two defenses: That the contract has been canceled, and that the license has not been exercised by it since adoption of the Hater improvement early in 1922. The trial court held that the contract had not been terminated by Spillman's notice in view of the prior custom of the parties, and that royalties were due upon pistons manufactured under either the Spillman or the Hater patents, for the reason that although those of the latter type were not an infringement of the Spillman patent, nevertheless the contract royalty provisions were broad enough to cover them.

As to cancellation: Clearly the provisions were inserted for the benefit of the licensor and not of the licensee; they were designed to give him additional rights in case of a breach. He had the option to give or not to give notice that the agreement "shall be cancelled" at the expiration of 60 days; the licensees then had the right to avert the impending cancellation by repairing the breach. If it failed to do so within the specified period, what would be the result? The contract says "then this agreement shall cease and determine." Is the termination thereby made automatic or is it again at licensor's option? Licensee is the wrongdoer; it has failed to avail itself of the opportunity to repair the breach. Unless the language compels the construction of automatic cancellation, thus giving the wrongdoer possible direct benefits, the clause will be held to confer a right only upon the other party, the licensor. In our judgment its true meaning is that the licensor may end the agreement and the license but that, despite the notice, he need not avail himself of this additional right; he

may treat the contract as continuing in full force and effect.

Evidently this was Spillman's interpretation. The notice of March 27, 1924, stated that unless the breach was made good in 60 days the agreement "will *be* cancelled"; not that it will then be at an end. The implication is clear that he contemplated some further positive act of cancellation at that time. Any act on or after May 26th inconsistent with a recognition of the continuance of the license would suffice; but the attorney's letter of June 2d was not such an act. Spillman had demanded $750; the attorney stated that the acceptance of $250 would "kill the notice and this we don't want to do." He was not prepared at that time to waive any rights that he might have unless the entire $750 was paid; he demanded that the original demand be complied with, with the implication that, if this be done even after the 60 days, default would be waived. He did not, however, claim cancellation, if it were not paid; so far as he was concerned no definite conclusion had been reached. And in this respect, there was no change; Spillman never took any affirmative step toward cancellation. We concur therefore in the conclusion of the trial court that the notice of March 27, 1924, was not the act of termination but a routine request for payment which by the common understanding of the parties growing out of their past dealings operated as notice of an intention to terminate, not of a definite termination, in case of noncompliance.

Giving the broadest scope to the Spillman patent, it is at least doubtful whether defendant's product could be held to be an infringement. Spillman expressly limited his claims to spiral *slits* with resultant tongues on *both* sides of the piston; such a limitation may well have been required by the state of the prior art which even a licensee estopped to deny validity may invoke to limit the scope of licensor's claims. Westinghouse Electric & Mfg. Co. v. Formica Insulation Co., 266 U. S. 342, 45 S. Ct. 117, 69 L. Ed. 316. We need not, however, express concurrence with or dissent from the views of the trial judge that there is no infringement, because the question before us in this suit for specific performance is not whether the pistons sold by defendant infringe the Spillman patent, but whether they are covered by the Armstrong contract. If Spillman had perfected the Hater piston, then irrespective of whether invention or merely the exercise of ordinary mechanical skill was involved therein, it would have come within the license agreement covering improvements by him and thus have inured to the licensee's benefit. This, however, is not decisive of his right to claim royalties thereon. Defendant rests its case upon the proposition that royalties can never be payable under a license agreement upon articles which do not infringe. Without pausing to inquire into the soundness of plaintiff's counter proposition that all articles substantially embodying a patented concept are subject to royalty payments under a license even though they may not technically fall within the exact limitations of the patent, we shall assume the correctness of defendant's contention as to articles for which the protection of the patent has not been claimed and taken advantage of. It is unnecessary therefore to discuss all of the possibly conflicting inferences deducible from Eclipse Bicycle Co. v. Farrow, 199 U. S. 581, 26 S. Ct. 150, 50 L. Ed. 317; Loose v. Bellows Falls Pulp Plaster Co. (C. C. A.) 266 F. 81; and other cases cited.

Defendant was expressly obligated to pay royalties upon "every piston manufactured and sold under said patent right pursuant to this agreement." Had defendant sold the Hater pistons without any claim to protection under the Spillman patent, instead of marking them "Patented" when this word could refer only to Spillman patent, No. 1,325,176, and of equipping the pistons with what it now says is a practically useless slot so as to resemble Spillman as closely as possible in appearance; had it marketed the pistons under any other name than the one which the public had come to associate with the Spillman patent and which had been granted to defendant for use only upon the patented article; had it in its dealings with Spillman frankly asserted its alleged rights in derogation of the license so as to give him immediately the opportunity of licensing a competitor, instead of for two years conceding by royalty payments that the license was applicable—it might now well claim that it had not been manufacturing and selling under the Spillman patent. Actually, however, defendant secured what it had primarily bargained for, protection in fact from interference by plaintiff and all third parties with the monopoly of its article, and it got this by deliberately purporting to manufacture and sell its pistons under the patent and the contract.

Defendant misconceives the gist of plaintiff's case in arguing that it did not promise to pay 35 cents per piston for the use of a

trade-mark; the true importance of the continued use of "Kant-Skore" on defendant's piston is that in connection with the other recited circumstances, it shows that defendant's aim was to avail itself throughout of the right to manufacture and sell under the license, just as defendant's course in choosing not to give plaintiff notice of cancellation in 1922, when by so doing it might have provoked competition before the Hater piston was firmly entrenched in public favor, is indicative of a like purpose. Whatever defendant's rights may be apart from contract to the use of "Kant-Skore" in its corporate name, the license was the sole source of its right to use the word descriptively. The Patent Office registration of the mark in defendant's name, founded as it was upon the representation that defendant was the successor of the prior manufacturers of Spillman pistons and upon plaintiff's acquiescence in 1923 when defendant was paying royalties on Hater pistons, in no wise helps its case.

The decree appealed from directs the accounting for pistons made after the time of accounting. There is no error herein, even though defendant, at the latest, by its answer, publicly denied that it was manufacturing under the license, because the important consideration is not when it said that it was no longer so doing, but when it in fact actually gave up the rights thereunder. Its obligations under the license continue so long as it identifies its pistons with the Spillman Kant-Skore pistons in any way, even though it asserts a deviation therefrom.

It is unnecessary, however, to determine, and we therefore do not decide whether the statement of the trial judge at the end of his opinion as to defendant's possible courses of action is in all respects complete.

We have duly considered, but find without merit, other alleged errors assigned but not strongly urged by defendant.

Decree affirmed.