**BUCKY et al. v. SEBO et al.**

United States District Court,
S. D. New York.

April 27, 1953.

---

Paul Kolisch, New York City, for plaintiffs.

Emanuel R. Posnack, New York City, for defendants.

RYAN, District Judge.

This suit was filed on August 30, 1949 for alleged infringement of three patents—Nos. 2,239,379, 2,292,044 and 2,422,077. The answer denies infringement and alleges invalidity as to all three patents; it contains a counterclaim and a prayer for affirmative relief by declaratory judgment adjudging that the patents in suit were not infringed and are invalid.

Application for patent No. 2,239,379 was filed by plaintiff, Gustav Bucky, on January 12, 1940; the patent issued April 22, 1941. He has been and still is the owner of it. Application for patent No. 2,292,044 was filed by this plaintiff on August 28, 1940; prior to issuance of the patent he assigned his entire interest in this application to plaintiffs, Frida Bucky, Peter A. Bucky and Thomas Lee Bucky; the patent issued to them on August 4, 1942. Application for patent No. 2,422,077 was filed by Gustav Bucky on September 27, 1944; the patent issued June 10, 1947; he has been and still is the owner of this patent.

Prior to trial defendants' motion for summary judgment was in part granted dismissing the complaint insofar as it asserted claims based on patent No. 2,422,077.

Defendant, Carl J. Sebo, was under an agreement with plaintiffs, dated De-

cember 4, 1944, the former exclusive licensee of the patents in suit. Defendant, Coreco Research Corporation, under an agreement with Sebo, dated November 15, 1946, was exclusive selling agent or distributor of the commercial products manufactured by Sebo at the Coreco factory under his license from plaintiffs. Until March 26, 1949, this license to Sebo was operative; it was then cancelled by the plaintiffs for non-payment of royalties. It is the commercial product of Sebo which he continued to manufacture and market through and with Coreco after cancellation of the license that is alleged to constitute infringement of the patents. Plaintiffs rely on all the claims of No. 2,239,379 and on the one claim of No. 2,292,044.

Plaintiff Gustav Bucky is a physician who is internationally recognized as an expert in the filed of roentgenology. He is known for his improvements in x-ray techniques. In his professional work he found need for a camera with automatic focusing and exposure devices adapted to photographing parts of the body. He first dealt with Carl J. Sebo, the father of the individual defendant, concerning the manufacture and production of cameras under the patents. After experimentation with Sebo, Sr., a model of a commercial structure was built. Bucky organized a corporation called Consolidated Research Corporation; in trade, he abbreviated the name to Coreco; and sold the first commercial product brought forth in collaboration with Sebo, Sr. under the patents in suit as the "Coreco-Bucky Camera." Thereafter, the licensing agreement of December 4, 1944 was made by Gustav Bucky, as owner of patent No. 2,239,379 and of patent application No. 555,948 (upon which patent No. 2,422,077 later issued) and Frida Bucky, Peter A. Bucky and Thomas Lee Bucky, as owners of patent No. 2,292,044, with Carl J. Sebo, the defendant, granting to Sebo "the exclusive but non-assignable, right and license to manufacture, sell and use the apparatus embodying, employing and containing the inventions" in these patents and application.

This agreement is Plaintiffs' exhibit 8 in evidence.

The agreement provides that "the licensee will use the name 'Coreco-Bucky' to designate products which he makes and sells under this agreement, and will so mark, label and describe all such products, which practice shall continue during the full term of this agreement unless amended in writing by the parties hereto." It was never so amended.

After the licensing agreement, the defendant corporation—Coreco Research Corporation—was organized and the camera continued to be manufactured by Sebo in the plant of that corporation. Sebo, on November 15, 1946, made an agreement with Coreco Research Corporation. It recites the licensing agreement Sebo had with plaintiffs and states that the purpose of the parties was to arrange to manufacture "under said patent license." In it, Sebo agreed that he would manufacture the cameras exclusively upon the order of the corporation for the life of the patents; that the manufacture of these would be in the plant of the corporation, which plant it agreed to make available to Sebo for that purpose, and that the corporation would have the exclusive right to sell the cameras so manufactured by Sebo. Although the agreement contains a specific undertaking by Sebo "that during the continuance of this agreement, he will well and truly perform all the terms and conditions of the agreement between him and Gustav Bucky, Frida Bucky, Thomas Lee Bucky and Peter A. Bucky, dated December 14th, 1944 (sic)," there is no like or counterpart obligation in words expressed by Coreco Research Corporation. (Defendants' Ex.F).

In the agreement the product to be manufactured by Sebo and sold by Coreco is designated "Coreco Automatic Color Camera"; nowhere in the agreement is it referred to as the "Bucky" or the "Coreco-Bucky" camera. Following the date of this agreement all cameras manufactured by Sebo were sold by Coreco. Royalty payments to plaintiffs under the licensing agreements were made by the

Coreco Research Corporation for Sebo, amounting to $17,197.60.

After the agreement, the defendant Sebo functioned as a vice president of the company and was engaged in the manufacture of the camera and its sale by Coreco. Up to the time of the cancellation of the Sebo agreement with Bucky, Sebo owned 50% of the capital stock of the defendant Coreco Research Corporation; although he has since sold his stock he continues to be the chief executive of that corporation.

The patents in suit are designed to be embodied in cameras constructed to fill requirements of clinical photography and to meet the specific needs of research. The patents purport to remove the human element from photography by the substitution of a completely automatic mechanism. It appears that given a working camera, suitable film or plate and proper lighting on the object to be photographed at least four physical conditions must be accurately adjusted to obtain a good photographic reproduction. These are: the distance from the object to be photographed to the lens of the camera; the distance between the lens and the film; the diameter of the aperture or "f" opening by way of which light passes through the lens to the film; and the duration of the exposure of the film to light. These adjustments are made by the use of the metal contrivance disclosed, called the "applicator." In the commercial product, a camera is built into a housing or casing with a slot in the housing permitting the insertion of a bracket affixed to the applicator. The applicator is designed to effect the adjustments by the insertion of it in the slot of the housing. It is undisputed that the gadget has proved efficient and has received commercial acceptance. All represent it as making clinical photography to one not possessed of special knowledge possible "by the complete removal of the human element from photography and by the substitution of a completely automatic mechanism which holds all the photographic factors constant at all times."

A number and variety of applicators and applicator sets have been designed. Thus, there are manufactured and sold the "opthalmological set," the "pathological set," the "eye, ear, nose and throat set," the "standard dental set," and several others. Each set includes an individual applicator; each applicator designed for use in photographing specific areas or cavities of the body, such as the mouth, ear, nose, etc. It has been called a focusing applicator, for by its use automatic focusing is achieved: it sets the correct "f" opening, the film-lens distance, the lens-object distance and applies the camera to the specific area to be photographed.

The applicator is a narrow, rigid metal bar to which another shorter narrow, rigid, metal bar or bracket is permanently affixed at right angles, and to which a small, metal frame is permanently affixed at right angles at one ned. The applicator consists then of three elements, each designed to perform a separate function: (a) the right-angle bracket designed to be attached to the camera sets the diameter of the aperture of the lens and the time of exposure; (b) the segment extending rearward of the bracket, which is adapted coincidentally upon its insertion in the camera to shift the film-holder rearward, determines the distance between the lens and the films; and (c) the segment of the bar extending forward of the bracket to the end of which is affixed the frame, fixes the distance between the lens and the object to be photographed. The invention is described as "a focusing device for a photographic camera" including an objective part and a holder part for an element having a light sensitive surface (film). The holder part, as illustrated in the drawings accompanying the patent (No. 2,239,379), consists of the lens, the plate or film holder and the usual light-tight, expansion, bellows-type container, enclosing the space between the lens and the plate or film holder.

With these observations, we consider the patents in suit with particular reference to the accused products.

Patent No. 2,239,379 describes a "Self-Focusing and Illuminating Device for Photographic Cameras." The patent embraces 19 claims. The invention is described as mainly comprising "a member selective as to the size or distance of the object area to be photographed, said member embodying means for adjusting the relative distance between the camera objective and the sensitive surface of the plate or film within said camera. * * *" It is also stated that "the invention further consists in illuminating means and means for directing light rays upon the object area of selected size at its correct focal distance in relation to the objective and the sensitive surface," and "in means for administering the correct quantity of light to the sensitive surface during the exposure."

Patent No. 2,292,044 describes a means for "Illumination of Cameras" and is described as relating to "a system and apparatus for illuminating an object or scene to be photographed and upon which the photographic camera is directed." It states that the invention comprises "in combination a light source arranged laterally of the axis of the camera objective, and a reflector in front of said objective and so arranged as to reflect a light beam from said source substantially in the direction of the object upon which the camera is focused, and a shutter so operable as to prevent light rays of said source from impinging on said reflector before said light source has reached full power." The patent contains one claim.

Bucky built an ordinary or bellows-type camera into a casing or housing which contained in addition an electric bulb and a mirror, the latter so inclined as to reflect the light from the bulb upon the object to be photographed, and for the camera, he devised his applicator.

The applicator is called a "detachable member" in claim 4 of the Bucky patent No. 2,239,379 (and this claim is representative of claims 1 to 17 of the patent). The three elements of this detach-able member are described (a) as above designated, being "adapted to be attached to said fixed camera part"; (b) as above designated, being "adapted to shift said movable part into a predetermined relative position coincidentally with the attachment of said member against the restraint of said resilient means"; and (c) as above designated, as "projecting, when in operative position, a predetermined length forward from said objective in the direction of the objective axis and being determinative of an area in focal relation to said camera parts." In the application, the right-angle bracket (a) of the applicator is shown as designed to be inserted in an oblong slot in the camera casing.

Examination shows that in the disclosure of the Bucky patent (No. 2,239,-379) as the movable part of the camera (the film-holder) is displaced or pushed away from the lens upon the insertion of the applicator into the casing, it pulls upon a wire or cord, one end of which is attached to the movable part and the other to a lever attached to the diaphragm in front of the lens. The more the movable part is pushed back by the applicator, the longer the wire or cord and the greater the pressure on the diaphragm lever; this lever serves to close the diaphragm, which is set at its maximum diameter, into a smaller aperture as pressure through the cord is applied. Thus, the length of the member of the applicator inserted into the casing determines the diameter of the diaphragm or "f" opening. In the accused structure, the wire or cord has been abandoned and in place of it, the size of the opening is directly fixed by the applicator inserted; each applicator has a hole punched through the member inserted. The size of the hole varies with each applicator, which in turn is designed for photographing a particular portion of the human body.

The castings for the first products manufactured under the patents were made by the father of the defendant Sebo. This was prior to the licensing agreement of 1944. It was before this

licensing agreement that Bucky, in his own laboratory with the aid of his own mechanic, changed the means employed for controlling the size of the "f" opening from that disclosed in his patent. This modification of construction eliminated the wire or cord which was attached to the movable part of the camera and to the lever attached to the diaphragm in front of the lens, and for this he substituted a thin, metal strip, which was pulled down in front of the lens, much like a window shade, by the insertion of the right-angle bracket (a) in the oblong slot in the casing. This strip had three holes of different diameter punched through it; the size of these controlled the amount of light which was permitted to pass through the lens of the camera to the film or plate; the predetermined length of the applicator selected which hole was brought into position before the lens.

Bucky produced and sold a few cameras embodying this modification of design in 1942.

After experimentation with the structure disclosed and modified by Bucky, Sebo and Coreco brought forth the commercial model in which the metal tape was eliminated and the hole required for the particular photographing being done was punched in the rod of the applicator itself, and in which, in addition, the pushing back of the film holder to the required position was eliminated and the film holder was manually pulled back into position, where it came to rest by spring tension against the applicator. In use, they had found that the tape with the holes in it was frequently pushed off center and was subject to jamming; that the tape limited the use of the camera without the applicator to but the three holes and that the continued pressure on the rod occasioned by pushing against the film holder caused it to bend and go out of shape.

In both the device disclosed by plaintiffs' patent and in the defendants' accused product, the sole act of attaching the applicator to the housing of the camera automatically establishes the focusing adjustments, i. e., fixing the position of the object to be photographed, the distance between the object and the lens, and the distance between the lens and the film. In the Bucky camera, the applicator is inserted in the slot in the housing; pushed manually as it is inserted, the force so exerted through the applicator shifts or pushes the movable part of the camera (the film holder), and establishes the distance between the lens and the film. The selective length of that portion of the applicator so inserted in the housing fixes this distance; a spring which holds the movable part in position after insertion of the applicator is tensioned by the pushing of the applicator in the slot. In the defendants' structure, the comparable member of the applicator is not inserted in the casing but is affixed to the exterior thereof; although the distance between the lens and the movable part of the camera is like in the Bucky structure determined by the selective length of the member, the shifting of the movable part is accomplished, not by the pushing force of the member, but by a separate, manual pulling back of the movable part, which is then held in place against the comparable member of the applicator by the spring attached to the movable part. Thus, in the Bucky structure, the spring is tensioned by the insertion of the applicator; in the defendants' it is tensioned by a manual pulling.

The mechanical means employed for fixing the size of the diaphragm opening is entirely different from that of plaintiffs' structure; the manner in which this means is applied is substantially different; the result alone is identical— that is, the applicator fixes the diaphragm opening. But the plaintiffs acknowledge that herein lies no infringement.

Both structures employ a similar lighting and inclined mirror reflecting arrangement. Although the patent includes claims that the applicator will automatically determine the size of the diaphragm opening to the lens of the camera and the arrangement of the light

and mirror these were described by plaintiffs on trial as subsidiary claims. Their position was then stated:

"We stand or fall on the conception of controlling the focusing, by focusing meaning the distance between the object and the lens and the lens and the film." (S.M. 6)

What was achieved by Bucky, according to his claims as interpreted by his expert called on trial, was "that the focusing was automatic and the relative placing of the object and of the apparatus, and, at the same time, also the regulation of the quantity of light which came to the photographic plate." (S.M. 20) And, further (S.M. 23–24):

"The idea was to use a rigid member that could be applied to the camera which does automatically in applying it the following functions: It gives, first, the position of the object to be photographed and the photographic apparatus, that there is a rigid connection between the apparatus and the object to be photographed; then, secondly, in applying this organ, what is given, the fixed position relative, is regulating automatically the distance between the lens and the photographic plate; and, thirdly, also—this is less essential, but it is also implied in the invention—to regulate the quantity of light falling to the photographic plate which has to be modified with the distance of the object. Those are the three effects which are brought about by applying this rigid organ on the camera, and this was, really, the essence of the solution."

We follow the "cautionary admonition," Harries v. Air King Products Co., 2 Cir., 1950, 183 F.2d 158, 162, expressed in Sinclair & Carroll Co. v. Inter-Chemical Corp., 1945, 325 U.S. 327, 65 S.Ct. 1143, 89 L.Ed. 1644, by first considering the validity of the patents in suit to the extent that they are here in issue.

The licensing agreement of December 4, 1944 contained the following provision:

"Fifteenth: The licensee hereby acknowledges validity of the aforesaid patents and agrees never to contest, directly or indirectly, the validity of the same during the life of the said patents nor to infringe the same by any manufacture, use or sale of the products not authorized hereunder, nor aid or abet others in infringement thereof."

This covenant estops the defendant Sebo for the life of the patents from contesting their validity. The agreement is "in such express and clear words that the intent could not be doubtful", Eskimo Pie Corp. v. Nat'l Ice Cream Co., 6 Cir., 1928, 26 F.2d 901, 902; it operates to estop Sebo from contesting the validity of the patents even after the licensing agreement had been terminated because of his default in payment of royalties.

Although we conclude that the defendant Sebo may not contest the validity of the patents in suit, because of express covenant not to, it does not necessarily follow that the defendants are precluded from reference to the prior art to acquit their commercial product of charge of infringement. Thus, the defendants "may refer to the prior art for the purpose of construing the patent, and of showing that what is complained of is not covered by it". Pressed Steel Car Co. v. Union Pac. R. Co., 2 Cir., 1920, 270 F. 518, at page 524. A licensee even though estopped to deny validity may invoke prior art to limit the scope of the licensor's claims and "to construe and narrow the claims of the patent, conceding their validity." Westinghouse Electric & Manufacturing Co. v. Formica Co., 1924, 266 U.S. 342, 351, 45 S.Ct. 117, 120, 69 L.Ed. 316.

It is conceded by plaintiffs (and in fact it is obvious) that the mechanical means employed in the device disclosed by Bucky and in defendants' product to

control and accomplish the change in the diaphragm is different. There is a radical and significant difference in structure and means employed to make the products automatic and workable in this respect. The automatic control and production of the right light exposure is as equally important to the production of clear, sharp photographs as the automatic control of the focusing. Because of this difference the defendants urge there is and cannot be infringement.

■ No. 2,239,379 is a combination patent. To establish infringement it must be proved that every element made material in a claim is embodied in the accused device, Montgomery Ward & Co. v. Rogers, 4 Cir., 1939, 100 F.2d 721, certiorari denied 306 U.S. 663, 59 S.Ct. 788, 83 L.Ed. 1059, and the burden of proving this is upon plaintiff. Comolite Corp. v. Davidovicz, 2 Cir., 1940, 111 F. 2d 121.

It is the contention of the defendants that all 19 claims contain as an element a special type of detachable member, comprising several portions, one of which is adapted to shift the movable part of the camera coincidentally with the attachment of the member to the camera. Therefore, it is urged that the alleged invention covered is limited to one having the particular coincidental shifting arrangement described in each of the claims, and since neither the focusing member of the accused device nor the entire combination employed in it, contains this limitation there was no infringement.

The defendants rely upon three patents to show not anticipation but the state of the prior art—the Steadman patent No. 1,244,254—which by changing the focusing member changes the distance between the lens and the camera, the Dean patent No. 1,837,704 which shows three different sizes of focusing devices, and the Alderman patent No. Re.20, 281 which shows a single focusing member with a light attachment.

Steadman related the distance between the lens and the film holder to the distance between the lens and the object to be photographed by showing a flexible tape, which, as it was drawn out to the object to be photographed, varied the distance between the lens and the film holder. Bucky substituted a rigid member, his applicator, for this flexible tape, and so constructed his applicator that the member which fixed the distance between the lens and the object to be photographed was built into one rigid unit which included a member of fixed length which set a relatively determined distance between the lens and the film holder. The use of a member to determine object distance from the lens, as well as to focus the lens for the determined object area size had been disclosed by Steadman (Patent No. 1,244,254, claim 15). The employment of a rigid member for this purpose is shown by the Dean and Alderman patents.

The Bucky patent was allowed on the claims that the device was a combination of what was known in the art upon the statement that the focusing member was designed to shift the movable part of the camera (the film holder) coincidentally with the attachment of the member. Each of the claims allowed included the distinguishing feature that the "shift" was accomplished coincidentally with the attachment of the member.

What then is the scope of the Bucky patent claims? The claims embrace the combination use of a camera and a device used with the camera that measures the distance from the object to be photographed to the lens of the camera and, maintaining constant that distance, a device that simultaneously fixes the distance between the lens and the film by a shifting of the film holder, and a device that simultaneously controls the size of the diaphragm of "f" opening. We read the patent as affording protection to the device disclosed as a structure which presents a new combination of three means of operation all known to the art but which had never been mechanically performed simultaneously as to include a shifting of the film holder.

We have difficulty in accepting the contention that the accused structure presents the same mechanical means for so performing these three operations simultaneously. Besides, without now adjudging the invalidity of the claims, we would be disposed to hold them not infringed, as the means employed by the defendants to fix the diaphragm or "f" opening is substantially different from that disclosed in the Bucky patent.

 But the plaintiffs urge that defendants are by their conduct estopped from denying infringement as well as validity. Cf. Collis Co. v. Consolidated Machine Tool Corp., 8 Cir., 1930, 41 F.2d 641, 644-645.

A brochure published in 1948 by defendants to the number of 10,000 or 15,000 was distributed until March 1949 when the licensing agreement was cancelled to hospitals, clinics, doctors and men of scientific pursuits. The brochure presents the defendants' product as the Bucky camera, developed by Bucky and protected by the patents in suit. About 600 or 700 cameras were sold by defendants at a price of $750 a camera, each with a limited number of attachments. The accused product has been the only model manufactured and sold since the beginning of operations by the defendant under the license. All the cameras sold during the license period had a small plate affixed with the legend "Coreco-Bucky" and a plate bearing the numbers of the Bucky patents in suit; since filing of suit the plate with the patent numbers had been no longer affixed and the legend on the remaining plate has been changed to read "Coreco." Save for these changes, the defendants have continued to market cameras of identical construction as before cancellation. No notice was sent to prospective customers that the license from Bucky had been cancelled; to the contrary, the defendants continued to represent their product as the Bucky camera, made under his patents.

Plaintiffs called a pathologist who testified that the accused product was known in the medical profession as the "Bucky" camera, and that it was put on the market with a small plaque affixed to it which read either "Bucky-Coreco" or "Coreco-Bucky." He also testified that the camera had been displayed in an exhibit of Coreco at the Atlantic City meeting of the American Medical Association held in June 1949, and that it had then been orally represented to him as the Bucky camera or an "outgrowth of it" and that the manufacturers "had bought out the rights of Dr. Bucky." Plaintiffs also called an internist who testified that defendants' product was shown again in June 1951 at a technical exhibit of Coreco, that it was then orally represented by defendants as the "Bucky" camera and that Coreco "have now acquired the rights to the Bucky camera and are now manufacturing it."

It is urged (and we find it established by the evidence) that defendants held themselves out to be operating under plaintiffs' patents in the manufacture and sale of the accused product and that, therefore quite aside from contractual relations, they are estopped to deny infringement as well as validity.

However, it is contended by Coreco Research Corporation that, since it was not a party to the licensing agreement, it is not estopped from denying either infringement or validity of the patents in suit. This overlooks the fact that Coreco was organized after the granting of the license to specifically exploit the license and to sell the product manufactured under it; that it was created by Sebo and those associated with him to produce cameras under the patents, and that is the sole purpose it has ever served; that Sebo was beyond the time of the commencement of suit the owner of 50% of the outstanding capital stock, that Sebo at all times was and still is the managing executive and directing head of Coreco; that the very corporate name embodies the name "Coreco" which had previously been used by Bucky in marketing his camera prior to the licensing agreement; that this agreement itself provided in paragraph "Third" that "the licensee will use the name 'Coreco-

Bucky' to designate products which he makes and sells under this agreement, and will so mark, label and describe all such products"; that the defendants still designate the cameras they produce by the mark "Coreco"; that defendant, Coreco Research Corporation, circulated the pamphlet (Plaintiffs' Ex. 3) not only throughout the license period but for some time thereafter—in which not only were the cameras produced by it called "Coreco-Bucky" but that this was coupled with the statement that they were produced under the patents in suit; that the defendants have since the cancellation of the license held themselves out as the owners of these patents, and finally that the present commercial product of the defendants is identical to that produced and sold under the agreement.

Neither Katzinger v. Chicago Metallic Mfg. Co., 1947, 329 U.S. 394, 67 S.Ct. 416, 91 L.Ed. 374, nor Sola Electric Co. v. Jefferson Electric Co., 1942, 317 U.S. 173, 63 S.Ct. 172, 87 L.Ed. 165 cited by Coreco in support of its position that public policy would be contravened by the denial to Coreco of an opportunity to put the validity of the patents in issue is applicable. The situation presented in those cases involved price fixing and restraint of trade which are not here present.

Prior to trial plaintiffs withdrew the allegations of infringement of Patent No. 2,422,077 and the complaint was dismissed as to this patent. The order of dismissal did not provide that it was entered upon the merits. The withdrawal of the charge of infringement of this patent was not accompanied by an admission of non-infringement. The facts here are quite different from those before the court in Larson v. General Motors Corp., 2 Cir., 1943, 134 F.2d 450. In the Larson case there was an admission of non-infringement made in the course of litigation; this admission supported a factual finding of non-infringement and a judgment of dismissal on the merits. Here, the withdrawal by plaintiffs of the allegations of infringement and dismissal of the complaint as to in-fringement of this patent in advance of trial did not result in an adjudication of non-infringement on the merits and would not of itself deprive the defendants, in the face of the possibility of future charges of infringement, of their right to a declaratory judgment of non-infringement. Knaust Bros., Inc. v. Goldschlag, D.C., 1939, 28 F.Supp. 188; Id., 2 Cir., 119 F.2d 1022. But the defendants may not contest either the issue of infringement or of validity of this patent any more than they may of the other two patents. The prayer of defendants for a decree of non-validity of Patent No. 2,422,077 is denied.

■ Nor do we find that the evidence shows the patents in suit to be so a "scarecrow" or "so evidently invalid" that we should declare them invalid, absent a finding of infringement. Sinclair & Carroll Co. v. Inter-Chemical Corp., supra, 325 U.S. at page 330, 65 S.Ct. 1143; Harries v. Air King Products Co., supra, 183 F.2d at page 163; Frank, J. in Wabash Corp. v. Ross Electric Corp., 2 Cir., 1951, 187 F.2d 577, 589.

■ The complaint states a claim for patent infringement. The fact that the defendants have by agreement estopped themselves from asserting invalidity and by their conduct are precluded from disputing infringement does not change the essential nature of the suit so as to deprive this court of jurisdiction. Cf. Dunham v. Bent, C.C.Mass., 1885, 72 F. 60. The complaint pleads neither the covenants of the license to Sebo, the sub-license to Coreco, nor their subsequent acts; the first of which operates to estop the defendants from contesting validity and the second, infringement. The suit seeks not enforcement of contractual obligations but the protection of patent grants. Hartell v. Tilghman, 1879, 99 U.S. 547, 25 L.Ed. 357, is not apposite. This court has jurisdiction under Section 1338(a), 28 U.S.C.A.

Appropriate judgment may be submitted on notice granting injunctive relief to plaintiffs, providing for an accounting and other appropriate relief.