**BUCKY et al.  v.  SEBO et al.**
**No. 80, Docket 22820.**

United States Court of Appeals
Second Circuit.

Argued Oct. 8, 1953.

Decided Nov. 18, 1953.

See also 97 F.Supp. 277.

Paul Kolisch, New York City, for plaintiffs-appellees.

Emanuel R. Posnack, New York City (Jonas J. Shapiro and Janet Perlman, New York City, of counsel), for defendants-appellants.

Before CHASE, Chief Judge, and CLARK and FRANK, Circuit Judges.

FRANK, Circuit Judge.

An agreement between plaintiffs and defendant Sebo, dated December 4, 1944, gave Sebo an exclusive license under plaintiffs' patents Nos. 2,239,379 and 2,292,044, relative to cameras. The agreement provided that the licensee should never contest validity and would not infringe or aid others to infringe; it also provided that, if the licensee made default in the payment of agreed royalties and failed to remedy the default within fifteen days after written notice, "the licensors may, at their option, cancel this agreement and revoke the license." The corporate defendant was a sub-licensee. After paying royalties for some time (in the aggregate amount of some $17,000), there was a default, and, after the required notice of default, the plaintiffs notified Sebo in writing on March 25, 1949, that they "hereby cancel the agreement of December 14, 1944, and hereby revoke the licenses therein granted." Some five months later, on August 30,

1949, plaintiffs brought this suit for infringement of the patents.

■■ 1. The trial judge held, in effect, that there was no infringement. We think there was none. The judge did not pass on the patents' validity. But he held defendants estopped to deny both infringement and validity, and it is suggested that impliedly he found defendants guilty of unfair competition. See his opinion, 115 F.Supp. 555. On the basis of his findings and conclusions, he perpetually enjoined defendants from directly or indirectly making, using or selling the cameras which they had been making and selling and which did not infringe plaintiffs' patents.

2. Plaintiffs' complaint contains no suggestion of either infringement-estoppel or unfair competition. The pre-trial order, although it specifies validity-estoppel as an issue to be tried, is utterly silent concerning those other two issues. Since the pre-trial order was not expressly "modified at the trial," pursuant to Rule 16, it is arguable that neither of those issues was open. But as plaintiffs' counsel during the trial made at least a brief reference to the issue of estoppel re infringement, and as defendants' counsel did not then object or ask an adjournment, we think that the trial judge was at liberty to consider that issue, for we read Rule 16 in the light of Rule 15(b), Fed.Rules Civ.Proc., 28 U.S.C. (We shall take up later the matter of unfair competition.)

■ 3. We think, for the following reasons, the judge erred in respect of estoppel concerning infringement: During the existence of a patent license, the licensee may be estopped to contest validity.[1] But even this estoppel usually vanishes when the license terminates, either because of lapse of time or through complete repudiation of the li-

1. The scope of even such an estoppel has been narrowing. See, e. g., Sola Electric Co. v. Jefferson Electric Co., 317 U.S. 173, 63 S.Ct. 172, 87 L.Ed. 165; Scott Paper Co. v. Marcalus Mfg. Co., 326 U.S. 249, 66 S.Ct. 101, 90 L.Ed. 47; Edward Katzinger Co. v. Chicago Metallic Mfg. Co., 329 U.S. 394, 67 S.Ct. 416, 91 L.Ed. 374; MacGregor v. Westinghouse Electric & Mfg. Co., 329 U.S. 402, 67 S.Ct. 421, 91 L.Ed. 380; cf. Nachman Spring-Filled Corp. v. Kay Mfg. Co., 2 Cir., 139 F.2d 781.

cense by the licensee or by act of the licensor.[2] This is the more true as to infringement. For it is well settled that, even during the existence of the license, the licensee is not estopped to prove that his product is not within the claims of the patent.[3]

True, some cases hold that, when the license still endures and the licensor sues for royalties under the license agreement, the licensee is estopped to deny infringement in special circumstances such as these: (a) The license agreement specifically designates as included in the license the specific product on which the licensee has refused to pay royalties.[4] (b) The patent has become widely associated with a name by which the licensee continues to label his product.[5] We have found no case in which any such estoppel doctrine has been applied after termination of the license. Little wonder. For it would be peculiarly improper to apply it when—as here —the licensor has elected not to sue for royalties due under the license, but, instead, to cancel it and to sue on the patent for infringement.[6]

4. It is suggested, however, that some of the trial judge's findings of fact and conclusions add up to a determination of unfair competition. Although no mention of unfair competition was made in the pleadings or in the pre-trial order or at the trial, we would be disposed to hold that the trial judge or we could consider it, subject to the right of defendants to ask an oppor-

2. See, e. g., Dueber Watch-Case Mfg. Co. v. Robbins, 6 Cir., 75 F. 17, 26, per Taft, C. J.; N. S. W. Co. v. Wholesale Lumber & Millwork, Inc., 6 Cir., 123 F.2d 38, 41; Tate v. Baltimore & Ohio R. Co., 4 Cir., 229 F. 141, 142; Bucky v. Sebo, 276 App.Div. 545, 95 N.Y.S.2d 769.

3. See, e. g., Dwight & Lloyd Sintering Co. v. Greenawalt, 2 Cir., 27 F.2d 823; Pressed Steel Car Co. v. Union Pacific R. Co., 2 Cir., 270 F. 518, 524–525; Limbershaft Sales Corp. v. A. G. Spalding & Bros., 2 Cir., 111 F.2d 675, 677; Galion Iron Works & Mfg. Co. v. J. D. Adams Mfg. Co., 7 Cir., 105 F.2d 943, 947; Midland Steel Products Co. v. Clark Equipment Co., 6 Cir., 174 F.2d 541, 543–544; Noonan v. Chester Park Athletic Club Co., 6 Cir., 99 F. 90, 91; cf. Westinghouse Co. v. Formica Insulation Co., 266 U.S. 342, 350–352, 45 S.Ct. 117, 69 L.Ed. 316.

4. See Cold Metal Process Co. v. McLouth Steel Corp., 6 Cir., 170 F.2d 369, 378–380. There the plaintiff, a patent-owner, entered into a license agreement with the defendant. Subsequently the parties made a supplemental agreement providing that a specific machine, to be purchased by the licensee from someone other than the licensor, was nevertheless to be covered by the original license agreement and that the licensee was to pay royalties thereon. The licensee, in connection with the issuance of some of the shares of stock, then stated in a published prospectus that it was obligated to pay royalties to the licensor on this machine. The court held, in a suit by the licensor for royalties under the license agreement and its supplement, that the defendant was obliged to pay royalties on the specific machine even if it was not covered by the patent. The court said it was not deciding what the situation would have been if the licensee had "openly repudiated the applicability" of the patent "before the date of the suit."

5. Kant-Skore Piston Co. v. Sinclair Mfg. Co., 6 Cir., 32 F.2d 882; cf. Sproull v. Pratt & Whitney Co., C.C.S.D.N.Y., 97 F. 807.

6. Clearly not in point are cases where the patentee, as grantor of a license, is estopped to deny that a product is infringing when, in connection with the grant, he had represented that the license covered that product and the grantee had relied on this representation. See Westinghouse Co. v. Formica Co., 266 U.S. 342, 350–351, 45 S.Ct. 117, 69 L.Ed. 316; Piaget Novelty Co. v. Headley, 2 Cir., 108 F.2d 870. Cf. Collis Co. v. Consolidated Machine Corp., 8 Cir., 41 F.2d 640.

Likewise not in point is Collis Co. v. Consolidated Machine Tool Co., 8 Cir., 41 F.2d 640, 641. It was a suit for unfair competition in the use of a tradename; the court held the defendant was not guilty of laches since its delay had been induced by reliance on plaintiff's false public representations that certain articles were protected by plaintiff's patent which in fact had expired.

tunity to present further evidence to the trial court on that issue.[7]

There are findings which, if sufficiently supported by the evidence, might perhaps justify, not the permanent injunction which the judge ordered, but one enjoining the sale of defendants' cameras unless accompanied by appropriate notification that these cameras are unrelated to plaintiffs' and their patents.[8] These findings are as follows:

The plaintiff, Gustav Bucky, "first dealt with Carl J. Sebo, the father of the individual defendant, concerning the manufacture and production of cameras under the patents. After experimentation with Sebo, Sr., a model of a commercial structure was built, Bucky organized a corporation called Consolidated Research Corporation; in trade, he abbreviated the name to Coreco; and sold the first commercial product brought forth in collaboration with Sebo, Sr. under the patents in suit as the 'Coreco-Bucky Camera.'" The license agreement "provides that 'the licensee will use the name Coreco-Bucky to designate products which he makes and sells under this agreement, and will so mark, label and describe all such products, which practice shall continue during the full term of this agreement unless amended in writing by the parties hereto.' It was never so amended." A "brochure published in 1948 by defendants to the number of 10,000 or 15,000 was distributed until March 1949 when the licensing agreement was cancelled, to hospitals, clinics, doctors and men of scientific pursuits. The brochure presents the defendants' product as the Bucky camera, developed by Bucky and protected by the patents in suit. About 600 or 700 cameras were sold by defendants at a price of $750 a camera, each

with a limited number of attachments. The accused product has been the only model manufactured and sold since the beginning of operations by the defendants under the license. All the cameras sold during the license period had a small plate affixed with the legend 'Coreco-Bucky' and a plate bearing the numbers of the Bucky patents in suit; since filing of suit the plate with the patent numbers has been no longer affixed and the legend on the remaining plate has been changed to read 'Coreco.' Save for these changes, the defendants have continued to market cameras of identical construction as before cancellation. No notice was sent to prospective customers that the license from Bucky had been cancelled; to the contrary, the defendants continued to represent their product as the Bucky camera, made under his patents." "Plaintiffs called a pathologist who testified that the accused product was known in the medical profession as the 'Bucky' camera, and that it was put on the market with a small plaque affixed to it which read either 'Bucky-Coreco' or 'Coreco-Bucky.' He also testified that the camera had been displayed in an exhibit of Coreco at the Atlantic City meeting of the American Medical Association held in June 1949, and that it had then been orally represented to him as the Bucky camera or an 'outgrowth of it' and that the manufacturers 'had bought out the rights of Dr. Bucky.' Plaintiffs also called an internist who testified that defendants' product was shown again in June 1951 at a technical exhibit of Coreco, that it was then orally represented by defendants as the 'Bucky' camera and that Coreco 'have now acquired the rights to the Bucky camera and are now manufacturing it.' "

7. We reject defendants' contention that the district court had no jurisdiction of that issue: There was substantial basis for assertion of the claims based upon the patents, and accordingly the court had jurisdiction of those claims, with pendent jurisdiction of an unfair competition claim. See The Fair v. Kohler Die & Specialty Co., 228 U.S. 22, 33 S.Ct.

410, 57 L.Ed. 716; 28 U.S.C. § 1338(b); Schreyer v. Casco Products Corp., 2 Cir., 190 F.2d 921.

8. If there were unfair competition, damages however would be singularly difficult to compute because plaintiffs have not produced and sold, and are not now producing and selling any cameras, commercially.

We turn to the evidence which might be said to support these findings:

(1) Gustav Bucky testified that the few cameras sold before the license agreement were "experimental models" and "not a production model." He had no recollection as to "any details" of such sales. This evidence does not support any inference that any "commercial product" had been so sold before the license agreement as to create any public impression that Coreco-Bucky meant a camera made by Bucky or under the plaintiffs' patents. Accordingly, that defendants' cameras, after the cancellation, have been labeled Coreco did not, on that score, constitute unfair competition.

(2) The brochure published in 1948 related to the Coreco-Bucky cameras and indicated that they were made under plaintiffs' patents. Sebo testified that in March 1949, when the license was cancelled, there were on hand three or four thousand copies of this brochure but that most of them were dumped although "a few might have gotten out. They were not distributed in any mass quantity." For a short time after the cancellation, defendants substituted "sales sheets" until 1950, when they put out a new brochure which omitted any reference to plaintiffs' patents and which related solely to Coreco cameras without any mention of Coreco-Bucky.

(3) Plaintiffs' own witnesses stated that the camera sold during the period of the license agreement and before its termination was known as "the Bucky camera."

(4) The sole testimony as to oral representations consisted of the following: Plaintiffs' witness, Janoff, testified that he had seen cameras exhibited under the name Coreco at the American Medical Association meeting at Atlantic City in June 1951. The following colloquy then ensued:

"Q. Did you have a conversation with any person at that exhibit? A. Yes.

"Mr. Posnack: Your Honor, I am going to offer the same objection as to any testimony with respect to a conversation about these cameras.

"The Court: Overruled. I am not giving it much weight because it is not shown who this man is he spoke to. It is not shown that he was authorized to speak on behalf of the defendants. It is not shown that the defendants knew what this man at the exhibit was saying or representing. But I will take it. Standing alone, it has no weight.

"Mr. Kolisch: I understand your Honor. One of my purposes is to give the defendants a chance to put in such evidence as they have on the facts.

"The Court: The defendants do not have to put in any evidence on this if they don't want to.

"Mr. Kolisch: If they don't, that is where we stand.

"A. I asked the man who was exhibiting the camera if this was anything like the Bucky camera, which seemed to resemble it superficially to my eyes, anyway, and he said 'This is the Bucky camera.' I said, 'How do you have it here?' He said, 'We have now acquired the rights to the Bucky camera and are now manufacturing it.' "

Plaintiffs' witness Ehrenreich testified that at an American Medical Association meeting in June 1949, he saw the camera in the booth of the Coreco Company, that there were two men in the booth, demonstrating the camera, and that he spoke to one of them. The testimony and colloquy continues as follows:

"Q. Will you relate to the Court what the substance of that conversation was? A. Briefly, it was this: I had been impressed, knowing the camera that I used at Seaview, which I knew as the Bucky camera, or the Bucky-Coreco camera, and I saw this, and it seemed to me it was essentially the same. I then asked the man whether this was the Bucky camera.

"Mr. Posnack: I object to this testimony. There is no relevancy to the issue of infringement here. You don't charge here a palming off, do you?

"Mr. Kolisch: The decisions to which I called attention in the trial brief say that even in the absence of any contractual relations, where the defendant held itself out to be operating under the patents, that will either operate as an estoppel against the defendant to deny infringement and validity or will be taken into account by the Court when the defendant comes to court.

"The Court: You offer this in anticipation of a defense that they may offer?

"Mr. Kolisch: The defense that was stated to be one of the defenses.

"Mr. Posnack: Your Honor, there is nothing in record at all to justify it.

"The Court: We will take it. We will shorten the trial perhaps.

"A. I asked him whether this was the Bucky camera. He said yes, it was. Then I asked him why, if it was the Bucky camera, the plaque did not state so, because, as I recall, the camera that I used, the plaque stated the Bucky-Coreco camera, and the man said this was the same camera, or an outgrowth of it, and they had bought out the rights of Dr. Bucky."

In the light of the judge's comments at the trial and the vagueness and slight character of this testimony and the other evidence, we think there is insufficient foundation in the record for the conclusion that unfair competition has occurred and that an injunction on that ground is justified.

Reversed.

CLARK, Circuit Judge (dissenting).

While exactly parallel cases are hard to discover, I think the rationale of the decisions holding a patent licensee estopped to deny the validity of the patent supports also the grant of remedies to prevent such sharp business practices as defendants here indulged in.

There are two lines of pertinent authority. Absent any elements of "passing off," or other unfair conduct, a licensee, though he cannot deny the validity of the patent, is free to assert noninfringement and to show prior art in support of his defense.[1] But where a patentee has forestalled competition by holding himself out to the world as operating under the protection of a patent, he will not be heard to assert that the patent did not in fact apply.[2] Where a licensee has thus claimed protection, the same considerations are applicable and the resulting appropriation of the patentee's good will raises additional equities.[3] As against his patentee the case for estopping a licensee is even stronger, for by paying royalties on the license agreement and thus signifying his acquiescence he not only has gained patent protection against the world, but also has forestalled the licensing of potential competition with himself. Accordingly, where the licensee purports to operate under the license and the patentee elects to sue on the agreement, the li-

1. Midland Steel Products Co. v. Clark Equipment Co., 6 Cir., 174 F.2d 541, certiorari denied 338 U.S. 892, 70 S.Ct. 243, 94 L.Ed. 548; Galion Iron Works & Mfg. Co. v. J. D. Adams Mfg. Co., 7 Cir., 105 F.2d 943; Pressed Steel Car Co. v. Union Pac. R. Co., 2 Cir., 270 F. 518, 524; cf. Westinghouse Elec. & Mfg. Co. v. Formica Insulation Co., 266 U.S. 342, 45 S.Ct. 117, 69 L.Ed. 316.

2. Collis Co. v. Consolidated Machine Tool Corp. of America, 8 Cir., 41 F.2d 641, certiorari denied Consolidated Machine Tool Corp. of America v. Collis Co., 282 U.S. 886, 51 S.Ct. 90, 75 L.Ed. 781; Piaget Novelty Co. v. Headley, 2 Cir., 108 F. 870, 873. Nor is Collis any the weaker because the estoppel was worked in the course of a trade-mark suit. The issue was squarely presented and passed on.

3. See the reasoning of Judge Swan in Limbershaft Sales Corp. v. A. G. Spalding & Bros., 2 Cir., 111 F.2d 675, 677.

censee is estopped to deny infringement.[4]

As my brothers point out, existing authority for the estoppel doctrine involves situations where the license remains in effect and the licensee continues to assert a connection with the patentee. But I do not see why the presence of these factors should weaken the powerful thrust of the doctrine. Thus the second factor surely is not an absolute condition (nor does the opinion so claim). Or if it is, it is in substance satisfied here. Plaintiff, Dr. Bucky, was an expert of international renown in the field of roentgenology. His fame was largely responsible for the rapid acceptance of the accused camera. The similarity between "Coreco-Bucky," the original trade name, and "Coreco," the name in use when suit was brought, coupled with the trial court's finding of "passing off," [5] refutes any contention that defendants have announced to the world that the relationship is severed.

Nor can plaintiffs' cancellation of the license agreement be deemed controlling (except perhaps to indicate the appropriateness or duration of injunctive relief) where, as here, the cancellation was induced by the licensee's breach. From December, 1944, until March, 1949 (a few months before the commencement of this action), defendants held an exclusive license under the patent and paid royalties thereon. Plaintiffs were completely precluded from seeking alternative means of exploiting their monopoly, and any doubts as to the desirability of this arrangement were lulled by defendants' acquiescence in the relationship. Defendants have gained a four-year lead over any competitor Dr. Bucky may now seek to license. The injustice of now letting defendants disclaim the relationship is apparent.

Furthermore, until 1949, defendants asserted to the world that their camera was protected by Dr. Bucky's patents and avoided competition from outsiders. They have sought and received substantial benefits from the very relationship which they now assert is unnecessary.

True, it was plaintiffs who technically cancelled the agreement. Because of this, my brothers deem it "peculiarly improper" to allow relief. In my opinion, so to hold is to reward defendants' recalcitrance. It was they who first repudiated the relationship and refused to pay royalties. Thus this decision is an invitation to all in defendants' shoes to do their utmost to provoke a patentee to cancel his license.

I would affirm.

4. Cold Metal Process Co. v. McLouth Steel Corp., 6 Cir., 170 F.2d 369, 379; Kant-Skore Piston Co. v. Sinclair Mfg. Corp., 6 Cir., 32 F.2d 882, certiorari denied 281 U.S. 735, 50 S.Ct. 249, 74 L. Ed. 1150; Sproull v. Pratt & Whitney Co., C.C.S.D.N.Y., 97 F. 807.

5. Supporting evidence in the testimony and exhibits makes this finding immune from attack as "clearly erroneous." F.R. 52(a)..